1   ROBBINS GELLER RUDMAN
      & DOWD LLP
2   AELISH M. BAIG (201279)
    TAEVA SHEFLER (291637)
3   HADIYA K. DESHMUKH (328118)
    Post Montgomery Center
4   One Montgomery Street, Suite 1800
    San Francisco, CA  94104
5   Telephone:  415/288-4545
    415/288-4534 (fax)
6   aelishb@rgrdlaw.com
    tshefler@rgrdlaw.com
7   hdeshmukh@rgrdlaw.com

8   Attorneys for Plaintiff

9   [Additional Counsel Appear on Signature Page.]

10                   UNITED STATES DISTRICT COURT

11                 NORTHERN DISTRICT OF CALIFORNIA

12   BCTGM ATLANTIC HEALTH & WELFARE )   Case No.  3:22-cv-07348
     FUND, Individually and on Behalf of All )
13   Others Similarly Situated,             )   CLASS ACTION COMPLAINT
                                            )
14                         Plaintiff,       )
                                            )
15           vs.                            )
                                            )
16   MCKINSEY& COMPANY, INC.,               )
                                            )
17                         Defendant.       )   **JURY TRIAL DEMANDED**
18   ─────────────────────────────────

19

20

21

22

23

24

25

26

27

28

4873-1648-5695.v1

# TABLE OF CONTENTS

**Page**

I.   INTRODUCTION ..................................................................................................1

II.  JURISDICTION AND VENUE ...........................................................................5

III. PARTIES ..............................................................................................................6

IV.  CONTINUING VIOLATIONS ............................................................................7

V.   FACTUAL ALLEGATIONS ...............................................................................7

A.  Purdue Pleads Guilty to Misbranding Oxycontin and Is Bound by an Agreement ...........................................................................................7

B.  Purdue Hires McKinsey to Boost Opioid Sales in Light of the Company's Guilty Plea and Agreement .............................................8

1.  The Sacklers Distance Themselves from Purdue...........................9

2.  Purdue Hires McKinsey to Devise and Implement an OxyContin Sales Strategy Consistent with the Sacklers' Goals...................................10

C.  What McKinsey Does: "Consulting Is More than Giving Advice".......................13

D.  Purdue Relies on McKinsey...............................................................15

E.  McKinsey Delivers .............................................................................17

1.  Granular Growth ..........................................................................17

2.  "Identifying Granular Growth Opportunities for OxyContin" .................19

a.  Marketing – Countering Emotional Messages..............................19

b.  Targeting – Selling More OxyContin to Existing High Prescribers..............................21

c.  Titration – Selling Higher Doses of OxyContin ...........................22

d.  Covered Persons – Sales Quotas and Incentive Compensation ........................23

e.  Increasing the Overall Size of the Opioid Market: the Larger the Pie, the Larger the Slice ..............................25

F.  Transformation: Purdue Implements McKinsey's Strategies ..............................26

1.  Project Turbocharge.....................................................................27

2.  Evolve to Excellence.....................................................................28

G.  McKinsey's Efforts Triple OxyContin Sales........................................30

1
2                                                                                              **Page**
3
       H.     Tolling of Statutes of Limitations ................................................................32
4
            1.     Equitable Estoppel and Fraudulent Concealment ......................................32
5
            2.     McKinsey and Purdue Persisted in the Fraudulent Scheme Despite
6
                 a Guilty Plea and Large Fine ...............................................................33
7
       I.     McKinsey Knew ......................................................................................34
8
       J.     Coda ......................................................................................................39
9
            1.     Guilty Again ....................................................................................41
10
            2.     A *Mea Culpa* .................................................................................42
11  VI.   CLASS ACTION ALLEGATIONS .................................................................43
12  VII.  CAUSES OF ACTION ..................................................................................47
13         COUNT I: Violation of Racketeer Influences and Corrupt Organizations (RICO),
            18 U.S.C. §1961, *et seq*..............................................................................47
14
       COUNT II: Fraud (Actual and Constructive) and Deceit .............................................54
15
       COUNT III: Unjust Enrichment ..................................................................................56
16
   VIII.  JURY DEMAND .......................................................................................57
17
   IX.   PRAYER FOR RELIEF ...........................................................................57
18
19
20
21
22
23
24
25
26
27
28

I.      INTRODUCTION

1.      On May 10, 2007, John Brownlee ("Brownlee"), United States Attorney for the Western District of Virginia, announced the guilty plea of the Purdue Frederick Company ("Purdue Frederick"), the parent of Purdue Pharma, L.P. ("Purdue"), relating to the misbranding of OxyContin. Brownlee stated:

> Even in the face of warnings from health care professionals, the media, and members of its own sales force that OxyContin was being widely abused and causing harm to our citizens, Purdue, under the leadership of its top executives, continued to push a fraudulent marketing campaign that promoted OxyContin as less addictive, less subject to abuse, and less likely to cause withdrawal. In the process, scores died as a result of OxyContin abuse and an even greater number of people became addicted to OxyContin; a drug that Purdue led many to believe was safer, less subject to abuse, and less addictive than other pain medications on the market.

2.      Along with the guilty plea, Purdue agreed to a Corporate Integrity Agreement ("Agreement") with the Office of Inspector General of the United States Department of Health and Human Services ("HHS"). For a period of five years, ending in 2012, Purdue was obligated to retain an Independent Monitor and submit annual compliance reports regarding its marketing and sales practices and training of sales representatives *vis-à-vis* their interactions with health care providers.

3.      In the wake of Purdue's accession to the Agreement, Purdue faced newly imposed constraints on its sales and marketing practices. The Agreement was a problem to solve. Despite the Agreement's constraints (*i.e.*, do not lie about OxyContin), Purdue and its controlling owners, the Sackler family, still intended to maximize OxyContin sales.

4.      Given concern over this "concentration of risk," the two sides of the Sackler family spent considerable time and energy debating the best way to achieve distance from Purdue and, collectively, considered a variety of options for doing so. One option was to sell the company to or merge the company with another pharmaceutical manufacturer. Shire was discussed as a possible target, as was Cephalon, Inc., UCB S.A., and Sepracor Inc. The proceeds of such a transaction could then be re-invested in diversified assets, thereby achieving the Sacklers' desired distance.

5.      Another option was to have Purdue borrow money in order to assure Purdue had adequate funds to continue operating while the Sacklers, as owners, began to make substantial distributions of money from the company to themselves. Once again, the proceeds of the distributions could then be re-invested in diversified assets, thereby achieving the Sacklers' desired distance.

6.      In order to pursue *either* of these options, the Sacklers needed to maximize opioid sales *in the short term* so as to make Purdue – by then the subject of substantial public scrutiny – appear either as an attractive acquisition target or merger partner to another pharmaceutical manufacturer or as a creditworthy borrower to a lender.

7.      In short, the Sacklers planned to engage in a final flurry of opioid pushing in order to rid themselves of their pharmaceutical company dependency for good.

8.      Given the complexity of the problem, the Sacklers and Purdue realized that they would need assistance in achieving these internally contradictory objectives. Purdue did not have the capabilities in-house to design and implement a sales strategy for OxyContin that would achieve the Sacklers' objectives. They turned to the global management consulting firm McKinsey & Company ("McKinsey" or "Defendant"), which had already been advising the Sacklers and Purdue for at least three years, for help with their new problem.

9.      McKinsey accepted their request,[1] and by June 2009 McKinsey and Purdue were working together to increase sales of Purdue's opioids. McKinsey suggested a specific sales and marketing strategy based on McKinsey's own independent research and unique methodologies, and Purdue adopted that strategy. McKinsey and Purdue then implemented McKinsey's plan. Despite the strictures imposed upon Purdue by the Agreement, OxyContin sales began to multiply.

---

[1]   This Complaint assumes that Purdue asked McKinsey to design and implement the strategy for boosting opioid sales, and McKinsey accepted Purdue's offer. What is known is that McKinsey performed the work for Purdue. For the purposes of this Complaint, Plaintiff BCTGM Atlantic Health & Welfare Fund ("Plaintiff" or "BCTGM") and other Class members assume Purdue initiated the relationship with McKinsey. Should it arise that instead McKinsey pitched a proposal to increase OxyContin sales to Purdue, and Purdue accepted that proposal, then Plaintiff will amend this Class Action Complaint accordingly.

1      10.    In 2012, Purdue's Agreement ended. With its demise, McKinsey's ongoing

2 relationship[2] with Purdue flourished. In 2013, McKinsey proposed, and Purdue implemented with

3 McKinsey's ongoing assistance, *Project Turbocharge*, a marketing strategy to increase opioids

4 sales by **hundreds of millions** of dollars annually. Purdue then picked a new name – *Evolve 2*

5 *Excellence* ("E2E") – and adopted it as the theme to its 2014 national sales campaign. With

6 McKinsey's assistance, Purdue trained its sales representatives to operate pursuant to McKinsey's

7 strategy for selling OxyContin.

8      11.    In 2013, despite significant headwinds, OxyContin sales finally peaked. The

9 restrictions on Purdue's sales and marketing methods contained in the Agreement should have

10 resulted in fewer overall OxyContin sales: the guilty plea identified a specific segment of existing

11 OxyContin sales that were illegitimate and should, thus, cease. All else being equal, OxyContin

12 sales should have decreased to account for the successful snuffing out of improper sales. In fact,

13 OxyContin sales did decrease in the immediate aftermath of the 2007 guilty plea.

14      12.    Within five years, however, OxyContin sales would triple. McKinsey is responsible

15 for the strategy that accomplished this. It presented specific plans to Purdue, which Purdue adopted

16 and spent hundreds of millions of dollars implementing. The result: a final spasm of OxyContin

17 sales before the inevitable decline of the drug.[3]

18      13.    McKinsey has recently been the subject of scrutiny for its various business

19 practices, including its work facilitating the opioid crisis for Purdue.[4] On March 7, 2019, Kevin

20

_____

21 [2]   McKinsey espouses the idea of the "transformational relationship." It is not a one-off seller of advice for any given Chief Financial Officer ("CFO") problem of the day. Rather, McKinsey

22 argues that real value for the client derives from an ongoing "transformational" relationship with the firm. Duff McDonald, *The Firm: The Story of McKinsey and Its Secret Influence on American*

23 *Business*, 136-37 (2013) ("McKinsey no longer pitched itself as a project-to-project firm; from this point forth [the late 1970's], it sold itself to clients as an ongoing prodder of change, the kind

24 a smart CEO would keep around indefinitely.").

25    This Complaint tells the story of McKinsey's transformational relationship with Purdue.

26 [3]   On February 10. 2018, Purdue announced that it is no longer marketing opioids and disbanded its OxyContin sales force.

27 [4]   *See* Michael Forsythe and Walt Bogdanich, *McKinsey Advised Purdue Pharma How to*

28 *'Turbocharge' Opioid Sales, Lawsuit Says*, N.Y. TIMES (Feb. 1, 2019),

1   Sneader ("Sneader"), McKinsey's global managing partner, addressed all McKinsey employees

2   regarding this scrutiny. Drawing inspiration from Theodore Roosevelt, Sneader stated, "[W]e

3   cannot return to a time when we were in the background and unobserved. Those days have gone.

4   Indeed, I have little doubt that scrutiny – fair and unfair – will continue. It is the price we pay for

5   being 'in the arena' and working on what matters."[5]

6       14.   Weeks later, McKinsey announced that it is no longer working for any opioid

7   manufacturer. "Opioid abuse and addiction are having a tragic and devastating impact on our

8   communities. We are no longer advising clients on any opioid-specific business and are continuing

9   to support key stakeholders working to combat the crisis," McKinsey stated.[6] In addition to its

10   work for Purdue, McKinsey has performed work for "several other companies on opioids."[7]

11      15.   Plaintiff now argues that the price for being in the arena is more than scrutiny,

12   however fair. This Complaint argues that, like any other participant in the arena, McKinsey is

13   

14   https://www.nytimes.com/2019/02/01/business/purdue-pharma-mckinsey-oxycontin-opioids.html.

15   [5] *See* "*The Price We Pay for Being 'In the Arena'": McKinsey's Chief Writes to Staff About Media Scrutiny and Scandal*, FORTUNE MAGAZINE (Mar. 8, 2019),
16   https://fortune.com/2019/03/08/mckinsey-staff-letter-kevin-sneader/.

17   The "arena" reference is to *Citizenship in a Republic*, a speech delivered by Theodore
18   Roosevelt on April 23, 1910: "It is not the critic who counts; not the man who points out how the
    strong man stumbles, or where the doers of deeds could have done them better. The credit belongs
19   to the man who is actually in the arena [here, McKinsey; and the arena, opioid sales], whose face
    is marred by dust and sweat and blood; who strives valiantly; who errs, who comes short again
20   and again, because there is no effort without error and shortcoming; but who does actually strive
    to do the deeds; who knows great enthusiasms, the great devotions; who spends himself in a worthy
21   cause; who at the best knows in the end the triumph of high achievement, and who at the worst, if
    he fails, at least fails while daring greatly, so that his place shall never be with those cold and timid
22   souls who neither know victory nor defeat."

23   [6] *See* Paul La Monica, *Consulting firm McKinsey no longer working with opioid maker Purdue
    Pharma*, CNN BUS. (May 24, 2019), https://www.cnn.com/2019/05/24/business/mckinsey-
24   purdue-pharma-oxycontin/index.html. The statement was attributed to McKinsey as an entity. No
    individual's name was attributed.

25   [7] *See* Drew Armstrong, *McKinsey No Longer Consulting for Purdue, Ends Opioid Work*,
26   BLOOMBERG (May 23, 2019), https://www.bloomberg.com/news/articles/2019-05-24/mckinsey-
    no-longer-working-with-purdue-halts-opioid-consulting. While Plaintiff is aware of work
27   McKinsey has performed for other opioid manufacturers, this Complaint concerns McKinsey's
    work with Purdue.

28   

COMPLAINT -                                                                              - 4 -
4873-1648-5695.v1

liable for its deeds. McKinsey is liable for its successful efforts to increase OxyContin sales after Purdue's 2007 guilty plea for misbranding the drug. Indeed, McKinsey's *mandate* was to increase the sales of the drug *in light of the fact* that Purdue had plead guilty to misbranding, and the owners of Purdue now wished to exit the opioid market due to the perceived reputational risks of remaining there.

16.     McKinsey's task was to thread the needle: to increase OxyContin sales *given the strictures imposed by the five-year Agreement*. This McKinsey did, turbocharging[8] the sales of a drug it knew fully well was addictive and deadly, while paying at least tacit respect to the Agreement.

17.     These managerial acrobatics were necessary for Purdue to seem financially attractive enough that a potential buyer would be willing to discount (or even overlook) the otherwise obvious risks associated with purchasing the maker of OxyContin. Purdue was the proverbial hot potato. The Sackler family hired McKinsey to help them hand it to someone else. McKinsey obliged and devised a successful strategy to purposefully increase the amount of OxyContin sold in the United States. Their efforts *tripled* OxyContin sales.

18.     In the end, of course, the Sacklers never sold Purdue, and no one loaned it money. In time, the full scope of the opioid crisis would be clear not only to experts, insiders, and industry participants. Along with the rest of nation, Plaintiff is now squarely focused on the crisis.

## II.     JURISDICTION AND VENUE

19.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §1331, as Plaintiff brings a federal count of action that raises a federal question.

20.     This Court has personal jurisdiction over Defendant because Plaintiff's claims arise out of, or relate to, Defendant's purposeful availment of doing business in the state of California and in this District, including by engaging in the business of researching, designing, and implementing marketing and promoting strategies for various opioid manufacturers, including Purdue, in support of their sales and marketing of opioids in California.  Further, Defendant does

---

[8]    If the description is overbearing, note that it is McKinsey's own, as described below.

1  business by agent in California, directly and through the purposeful direction of its actions toward

2  California and has the requisite minimum contacts with California necessary to constitutionally

3  permit the exercise of jurisdiction.

4        21.     Venue is proper pursuant to 28 U.S.C. §1391.  This Court has personal jurisdiction

5  over Defendant as it purposefully availed itself of the privilege of exploiting forum-based business

6  opportunities, and the exercise of personal jurisdiction is consistent with Cal. Code Civ. Proc.

7  §410.10.

8  **III.   PARTIES**

9        22.     Plaintiff BCTGM Atlantic Health & Welfare Fund is located primarily in Ozone

10  Park, NY. BCTGM indirectly purchased, paid, and/or reimbursed for opioids intended for

11  consumption by its participants, covered dependents, and retirees and their families. Given its

12  participants', covered dependents', and retirees' history of purchases of opioids, BCTGM

13  anticipates that it will continue to purchase and/or provide reimbursement for opioids in the

14  foreseeable future.

15        23.     Defendant McKinsey & Company, Inc. is a foreign corporation with its principal

16  office at 711 Third Avenue, New York, New York 10017. It may be served with process through

17  its registered agent, Corporation Service Company, 80 State Street, Albany, New York 12207.

18  McKinsey is registered to do business in California and maintains multiple offices in Northern

19  California, including at 555 California Street, Suite 4700, San Francisco, California 94104, and

20  889 Winslow Street, Suite 300, Redwood City, California 94063.  Additionally, McKinsey

21  maintains an office at 2000 Avenue of the Stars, Suite 800N, Los Angeles, California 90067.  It

22  may be served with process through its registered agent, CSC – Lawyers Incorporating Service,

23  2710 Gateway Oaks Drive, Suite 150N, Sacramento, California 95833.

24        24.     McKinsey is a worldwide management consultant company. From approximately

25  2004-2019, McKinsey provided consulting services to Purdue, working to maximize sales of

26  OxyContin and knowingly perpetuating the opioid crisis.

27

28

IV.     **CONTINUING VIOLATIONS**

25.     This Complaint alleges a continuing course of conduct, and Defendant's unlawful conduct has inflicted continuing and accumulating harm within the applicable statutes of limitations.

V.     **FACTUAL ALLEGATIONS**

26.     This lawsuit concerns McKinsey's work for Purdue and its owner, the Sackler family, beginning at least as early as 2004, and in particular McKinsey's work in the years after the 2007 guilty plea relating to Purdue's sales and marketing strategy for its opioids.

27.     McKinsey had an ongoing relationship with Purdue beginning at least as early as 2004 and lasting decades. By June 2009, McKinsey was advising Purdue on precisely the same sales and marketing strategy and practices for OxyContin that were the subject of the Agreement. McKinsey continued this work after the expiration of the Agreement and at least through November 2017.

A.     **Purdue Pleads Guilty to Misbranding Oxycontin and Is Bound by an Agreement**

28.     On May 10, 2007, the Purdue Frederick, Purdue's parent, as well as three of Purdue's officers, pleaded guilty to the misbranding of OxyContin pursuant to various provisions of the Federal Food, Drug and Cosmetic Act, 21 U.S.C. §301, *et seq.*

29.     Purdue admitted that "supervisors and employees, with the intent to defraud or mislead, marketed and promoted OxyContin as less addictive, less subject to abuse and diversion, and less likely to cause tolerance and withdrawal than other pain medications."

30.     Concurrent with the guilty plea by the Purdue Frederick, Purdue entered into an Agreement with the Office of Inspector General of the HHS on May 7, 2007.

31.     Purdue's compliance obligations under the Agreement ran for a period of five years, expiring on May 10, 2012.

32.     Pursuant to the Agreement, Purdue was obligated to implement written policies regarding its compliance program and compliance with federal health care program and United States Food and Drug Administration ("FDA") requirements, including,

> "selling, marketing, promoting, advertising, and disseminating Materials or information about Purdue's products in compliance with all applicable FDA requirements, including requirements relating to the dissemination of information that is fair and accurate … including, but not limited to information concerning the withdrawal, drug tolerance, drug addiction or drug abuse of Purdue's products;

> compensation (including salaries and bonuses) for Relevant Covered Persons engaged in promoting and selling Purdue's products that are designed to ensure that financial incentives do not inappropriately motivate such individuals to engage in the improper promotion or sales of Purdue's products;

> the process by which and standards according to which Purdue sales representatives provide Materials or respond to requests from HCP's [health care providers] for information about Purdue's products, including information concerning withdrawal, drug tolerance, drug addiction, or drug abuse of Purdue's products," including "the form and content of Materials disseminated by sales representatives," and "the internal review process for the Materials and information disseminated by sales representatives."

33.     Purdue was obligated to engage an Independent Review Organization to ensure its compliance with the strictures of the Agreement, and to file compliance reports on an annual basis with the inspector general.

## B.     Purdue Hires McKinsey to Boost Opioid Sales in Light of the Company's Guilty Plea and Agreement

34.     The Sackler family has owned and controlled Purdue and its predecessors since 1952. At all times relevant to this Complaint, individual Sackler family members occupied either six or seven of the seats on Purdue's Board of Directors ("Board"), and at all times held a majority of Board seats. To advise Purdue's Board was to advise the Sackler family. The interests of the Sackler family and the Purdue Board, and Purdue itself, as a privately held company, are all aligned. Practically, they are indistinguishable.[9]

---

[9]   Craig Landau ("Landau"), soon to become CEO of Purdue, acknowledged in May 2017 that Purdue operated with "the Board of Directors serving as the 'de facto' CEO." The future CEO of the company, in other words, understood that he would have little practical power despite his new title. The owners ran the business.

### 1.     The Sacklers Distance Themselves from Purdue

35.     After the 2007 guilty plea, the Sackler family began to reassess its involvement in the opioid business. On April 18, 2008, Richard Sackler, then the co-chairman of the Board along with his uncle, communicated to other family members that Purdue's business of selling OxyContin and other opioids was "a dangerous concentration of risk." Richard Sackler recommended a strategy of installing a loyal Chief Executive Officer ("CEO") of Purdue who would safeguard the interests of the Sackler family, while at the same time positioning Purdue for an eventual sale by maximizing OxyContin sales.

36.     In the event that a purchaser for Purdue could not be found, Richard Sackler stated Purdue should "distribute more free cash flow" to the Sacklers. This would have the effect of maximizing the amount of money an owner could take out of a business, and is a tacit acknowledgement that reinvestment of profits in the business was not a sound financial strategy. It is, in other words, an acknowledgement that Purdue's reputation and franchise was irrevocably damaged, and that Purdue's opioid business was not sustainable in the long term.

37.     By 2017, with the hope for any acquisition now gone, the Sacklers' decision to milk opioid profits by "distributing more free cash flow" on the way down had its natural effect on Purdue. Landau, then the CEO, stated, "the planned and purposeful de-emphasis and deconstruction of R&D has left the organization unable to innovate."

38.     In fact, in the years after the 2007 guilty plea, Purdue would retain only the absolute minimum amount of money within Purdue as possible: $300 million. That amount was required to be retained by Purdue pursuant to a partnership agreement with separate company. Otherwise, all the money was distributed to the owners.[10]

39.     Concurrently, the Sacklers backed away from day-to-day jobs at Purdue. During the ongoing investigation that resulted in the 2007 guilty pleas, "several family members who

---

[10]   *See* Jared S. Hopkins, *At Purdue Pharma, Business Slumps as Opioid Lawsuits Mount*, WALL ST. J. (June 30, 2019), https://www.wsj.com/articles/purdue-pharma-grapples-with-internal-challenges-as-opioid-lawsuits-mount-11561887120?mod=hp_lead_pos6.

worked at Purdue stepped back from their operational roles."[11] In 2003, Richard Sackler himself resigned as the president to assume his role of co-chairman. Dr. Kathe Sackler and Jonathan Sackler chose to exit their roles as senior vice presidents. Mortimer D.A. Sackler quit being a vice president.

40.     They remained on the Board, however.

41.     At the time Richard Sackler communicated these plans to distance the family from Purdue, the Sacklers had already established a second company, Rhodes Pharmaceuticals L.P. ("Rhodes"). The Sacklers established Rhodes *four months* after the 2007 guilty plea.[12] Rhodes' purpose was to sell generic versions of opioids. It was, in other words, a way for the Sacklers to continue to make money off of opioids while separating themselves from Purdue. By 2016, Rhodes held a larger share of the opioid market than Purdue. Through Purdue, the Sacklers controlled 1.7% of the overall opioid market. When combined with Rhodes, however, the Sacklers' share of the overall opioid market was approximately 6% of all opioids sold in the United States.[13]

### 2.     Purdue Hires McKinsey to Devise and Implement an OxyContin Sales Strategy Consistent with the Sacklers' Goals

42.     The Sacklers faced a problem: the need to grow OxyContin sales as dramatically as possible so as to make Purdue an attractive acquisition target or borrower, while at the same time appearing[14] to comply with the Agreement.

43.     Purdue and the Sacklers were well aware of the constraints posed by the Agreement. Indeed, during a May 20, 2009 Executive Committee Meeting, the discussion led to

---

[11]   Barry Meier, *Pain Killer: An Empire of Deceit and the Origin of America's Opioid Epidemic* 167 (2018).

[12]   *Billionaire Sackler family owns second opioid maker*, FIN. TIMES (Sept. 9, 2018), https://www.ft.com/content/2d21cf1a-b2bc-11e8-99ca-68cf89602132.

[13]   *Id.*

[14]   As one Purdue executive stated of Purdue's attitude toward the Agreement: "They did not listen to their critics and insisted they had just a few isolated problems. After the settlement, they didn't change – the way the sales force was managed and incentivized, everything stayed the same." David Crow, *How Purdue's 'one-two' punch fuelled the market for* opioids, FIN. TIMES (Sept. 9, 2018), https://www.ft.com/content/8e64ec9c-b133-11e8-8d14-6f049d06439c.

1   whether Purdue should have a single sales force marketing all Purdue products, including

2   OxyContin, or instead to "create a separate Sales Force for Intermezzo (a sleeping pill) that would

3   be comprised of approximately 300 representatives." John Stewart ("Stewart"), the Sacklers'

4   chosen CEO for Purdue at the time, saw an opportunity, and asked if the Agreement would apply

5   if Purdue were to launch Intermezzo and another Purdue product, Ryzolt (a branded version of

6   Tramadol, another narcotic painkiller), using the separate sales force. Might the new drug launch

7   fall outside of the Agreement? he asked.[15]

8       44.    It would not, he was told by Bert Weinstein, Purdue's Vice President of

9   Compliance.[16]

10      45.    Given the tension between compliance with the Agreement and the desire to sell

11  more OxyContin, Purdue needed help.

12      46.    Ethan Rasiel, a former McKinsey consultant, has described the typical way

13  McKinsey begins working with a client: "An organization has a problem that they cannot solve

14  with their internal resources. That's the most classic way that McKinsey is brought in."[17]

15      47.    Such was the case with Purdue. Because it did not have the requisite expertise to

16  address the problems posed by the Agreement internally, Purdue hired McKinsey to devise a sales

17  and marketing strategy to increase opioid sales in light of the Agreement and growing concern

18  about the "concentration of risk" that Purdue's business of selling opioids posed to its owners.

19      48.    In short, Purdue would pay money to McKinsey in exchange for McKinsey telling

20  the company how to sell as much OxyContin as conceivably possible so that the Sacklers could

21  obtain cash to diversify their investment holdings away from Purdue.

22

23

24

25  ──────────────
[15]   Purdue Executive Committee Meeting Notes and Actions, at 2 (May 20, 2009).

26  [16]   *Id.*

27  [17]   *How McKinsey Became One of the Most Powerful Companies in the World*, YOUTUBE (June
28  6, 2019), https://www.youtube.com/watch?v=BBmmMj_maII.

49.     Purdue's Executive Committee discussed Stewart's concerns regarding the constraints posed by the Agreement on May 20, 2009. Within weeks, McKinsey was working with Purdue to devise and implement new marketing strategies for OxyContin.

50.     Consistent with their plan to dissociate themselves from the company, the Sacklers appointed Stewart as the CEO of Purdue in 2007. The Sacklers viewed Stewart as someone loyal to the family. He had previously worked for a division of Purdue in Canada. Stewart's job was to assist the Sacklers with the divestiture or eventual orderly wind-down of Purdue. Stewart was paid more than $25 million for his services to Purdue from 2007 through 2013.

51.     Stewart, as CEO, was in charge of the relationship with McKinsey. He controlled workflow to and from McKinsey, and required his personal approval for any work orders with McKinsey.

52.     In addition, Purdue's Vice President of Corporate Compliance, "responsible for developing and implementing policies, procedures, and practices designed to ensure compliance with the requirements set forth in the [Agreement]," reported directly to Stewart.

53.     Throughout their relationship, McKinsey routinely obtained information from, advised, communicated with, and ultimately worked for the Purdue Board, controlled by the Sackler family.

54.     McKinsey would also work in granular detail with the Purdue sales and marketing staff, led during the relevant period by Russell Gasdia ("Gasdia"), Vice President of Sales and Marketing.

55.     From as early as June 2009 and continuing at least through July 14, 2014, Purdue routinely relied upon McKinsey to orchestrate their sales and marketing strategy for OxyContin. The relationship was characterized by ongoing interactions between teams from McKinsey and Purdue regarding not only the *creation* of an OxyContin sales strategy, but also its *implementation*.

C.     **What McKinsey Does: "Consulting Is More than Giving Advice"**

56.     Management consulting is the business of providing solutions to clients. Solutions take many forms, depending on the client's needs. "Management consulting includes a broad range of activities, and the many firms and their members often define these practices quite differently."[18]

57.     Broadly speaking, there are two schools of management consulting. "Strategy" consulting provides big-picture advice to clients about how they approach their business: how the business is structured, which markets to compete in, potential new business lines, and mergers and acquisitions. The strategy consultant would provide a plan to the client that the client may choose to adopt or not.

58.     "Implementation" consulting is what comes next. If strategy consulting is providing advice to a client, "implementation" work is what happens once the client has adopted the consultant's plan. After a client has adopted the strategy consultant's recommendations, the implementation consultant remains in place with the client to actually do the necessary work and execute on the plan.

59.     In his 1982 *Harvard Business Review* article entitled, "Consulting is More Than Giving Advice," Professor Arthur Turner of the Harvard Business School described the then-current state of the consulting industry's attitude toward implementation work:

> The consultant's proper role in implementation is a matter of considerable debate in the profession. Some argue that one who helps put recommendations into effect takes on the role of manager and thus exceeds consulting's legitimate bounds. Others believe that those who regard implementation solely as the client's responsibility lack a professional attitude, since recommendations that are not implemented (or implemented badly) are a waste of money and time. And just as the client may participate in diagnosis without diminishing the value of the consultant's role, so there are many ways in which the consultant may assist in implementation without usurping the manager's job.[19]

---

[18]   Arthur Turner, *Consulting is More Than Giving Advice*, HARV. BUS. REV. (Sept. 1982), https://hbr.org/1982/09/consulting-is-more-than-giving-advice.

[19]   *Id.*

60.     A core component of the McKinsey relationship is discretion. "The basis of any client relationship with the firm is trust. Companies share their most competitive secrets with McKinsey with the understanding that confidentiality is paramount. McKinsey consultants aren't even supposed to tell their own spouses about their client work."[20]

61.     Although McKinsey has historically been regarded as a "strategy" consulting firm, by the time it was working with Purdue, implementation services were a core component of the overall suite of services to "achieve transformational change" for its clients.[21]

62.     Describing McKinsey's approach to implementation, one McKinsey consultant stated, "On some of the most successful engagements I've seen, you can't even tell the difference between a McKinsey team member and one of our clients because we're working that cohesively together."[22]

63.     Another McKinsey Senior Implementation Coach described McKinsey's approach: "We're in there interacting with every element of that organization, from the welders or mechanics on the front line, all the way up to the board of directors."[23]

64.     In the broadest of generalities, then, McKinsey's business model, as a provider of strategy and implementation consulting services, is to partner with clients to pursue business objectives identified by McKinsey. Once the objective is identified, the client and McKinsey then engage in concerted action as a seamless and cohesive unit in order to implement the necessary means to achieve those objectives for the client.

---

[20] McDonald, *supra* note 2, at 308.

[21] For McKinsey's own description of its implementation services, *see* https://www.mckinsey.com/capabilities/implementation/how-we-help-clients (last visited Nov. 17, 2022).

[22] McKinsey on Implementation, YOUTUBE (May 1, 2017), https://www.youtube.com/watch?v=rEQOGVpl9CY.

[23] *Id.*

65.     Indeed, long after McKinsey's advice to Purdue was accepted and deployed as the theme of Purdue's 2014 national sales strategy, McKinsey remained with Purdue to assure proper implementation of McKinsey's strategies to maximize OxyContin sales.

### D.     Purdue Relies on McKinsey

66.     McKinsey is not hired to give casual advice. They are a corporate mandarin elite, likened to the Marines or the Jesuits.[24] United States Senator Mitt Romney ("Romney"), during his presidential campaign in 2012, told the editorial board of the *The Wall Street Journal* that as president he would approach reducing the size of the government by hiring McKinsey. A former consultant himself, Romney stated, "So I would have … at least some structure that McKinsey would guide me to put in place." In response to audience surprise, Romney said, "I'm not kidding. I would probably bring in McKinsey."[25]

67.     McKinsey is not cheap, either. A client does not choose to pay McKinsey unless it expects to receive advice it could not have obtained within its own organization. McKinsey offers solutions to clients facing challenges they feel they cannot adequately address on their own. In 2008, McKinsey's revenue was $6 billion.

68.     McKinsey has long touted the notion of "transformation" for its clients. It is the goal of every client relationship McKinsey develops, and, McKinsey argues, the best way to extract value from a client's use of McKinsey's services.

69.     At its core, the transformational relationship with clients is ***long-term***. It is the antithesis of a one-off contract wherein McKinsey performs one discreet project for a client and then concludes its business. Rather, "once McKinsey is inside a client, its consultants are adept at artfully creating a feedback loop through their work that purports to ease executive anxiety but

---

[24]    Said one former McKinsey partner to *BusinessWeek* in 1986: "There are only three great institutions left in the world: The Marines, the Catholic Church, and McKinsey." McDonald, *supra* note 2, at 165.

[25]    *Id*. at 1.

actually creates more of it."[26] The long term result can be "dependence" on the McKinsey consultants.

70.     This strategy of insinuating itself into all aspects of its clients' business proved enormously successful for McKinsey over the years. It was a strategy McKinsey encouraged its consultants to take with clients to great effect:

> The sell worked: Once ensconced in the boardrooms of the biggest corporate players in the world, McKinsey rarely left, ensuring a steady and growing flow of billings for years if not decades. In 2002, for example, *BusinessWeek* noted that at that moment, the firm had served four hundred clients for fifteen years or more.[27]

71.     Purdue was no different. McKinsey counted Purdue as a client at least as early as 2004. The precise duration of the relationship between McKinsey and Purdue and its owners has not been ascertained, although it is known that McKinsey worked with Purdue for years **before** Purdue's parent and officers first pleaded guilty to misbranding OxyContin in 2007, and that by June 2009 McKinsey was actively working with Purdue to increase OxyContin sales in light of that guilty plea and its accompanying Agreement. The work continued through at least 2018.

72.     McKinsey partner Gordian, in her March 26, 2009 "EY 2009 Impact Summary" internal report to McKinsey Director Olivier Hamoir and McKinsey's Personnel Committee, recounted her accomplishments that year on the Purdue account. The document is an annual self-assessment produced by McKinsey partners. In it, Gordian described the state of firm's relationship for Purdue:

> With client work extending through the 3rd quarter, and several additional proposals in progress, we continue to expand the depth and breadth of our relationships at Purdue. We look forward to deepening our relationships with the Sackler family

---

[26]  *Id.* at 6. Purdue provides a fine example of this feedback loop in action. In 2008, when McKinsey was advising Purdue regarding Risk Evaluation and Mitigation Strategies ("REMS") for OxyContin required by the FDA, McKinsey partner Maria Gordian ("Gordian") wrote to fellow partners Martin Elling ("Elling") and Rob Rosiello ("Rosiello") regarding progress in the "REMS work" as well as "Broader Strategy work." Regarding the latter, Gordian noted that Purdue Board members Jonathan Sackler and Peter Boer "basically 'blessed' [Landau] to do whatever he thinks is necessary to 'save the business.'. . . *I believe there is a good opportunity to get another project here*." (emphasis added).

Indeed, after the REMS work was completed, McKinsey continued to work on "Broader Strategy work" for another decade.

[27]  *Id.* at 136.

1    and serving them on key business development issues, and to expanding our
2    relationship with [John] Stewart and other members of the senior management
     team.

3        73.    McKinsey staffed at least 36 known consultants to Purdue, from senior partners all

4    the way down through engagement managers to entry-level associates. Throughout the unfolding

5    of the nationwide opioid crisis that only continued to worsen after the 2007 guilty plea, McKinsey

6    remained steadfast alongside the Sacklers and Purdue every step of the way. The *mea culpas* would

7    come only later.

8        **E.    McKinsey Delivers**

9        74.    By 2009, McKinsey was working with its long-time client to craft and implement

10   a sales and marketing plan to increase OxyContin sales in light of the Agreement and the

11   diminishing outlook for Purdue.

12       75.    In June 2009, McKinsey advised Purdue senior management, including Landau,

13   then the Chief Medical Officer ("CMO") and future CEO, regarding a variety of strategies to

14   increase Purdue's opioid sales that were developed using McKinsey's expertise and proprietary

15   approaches to problem solving.

16       **1.    Granular Growth**

17       76.    McKinsey prides itself on certain managerial techniques it professes to have

18   detailed knowledge of and expertise in deploying. These techniques are generally applicable to

19   problems encountered by many businesses; they are conceptual frameworks that McKinsey

20   deploys when tasked with solving a problem for a client.

21       77.    After the first guilty plea, the Sacklers desired dramatic, short-term growth of

22   Purdue's opioid sales was to increase the company's attractiveness as an acquisition target or

23   borrower while allowing the Sacklers to take money out of the company. One service McKinsey

24   offers to its clients is to tell them how to grow.

25       78.    In order to identify growth opportunities for a client, McKinsey espouses a

26   "granular" approach to identifying which subsets of the client's existing business are the sources

27   of growth and exploiting them for all they are worth. In August 2008, McKinsey directors Patrick

28   Viguerie and Sven Smit, together with Mehrdad Baghai, published a treatise on the matter: *The*

*Granularity of Growth: How to Identify the Sources of Growth and Drive Enduring Company Performance* (2008). "The key is to focus on granularity, to breakdown big-picture strategy into its smallest relevant components."[28]

79.     Previously, in an article in the *McKinsey Quarterly* (coincidentally published the same month that Purdue pled guilty), the authors explained:

> Our research on the revenue growth of large companies suggest that executives should "de-average" their view of markets and develop a granular perspective on trends, future growth rates, and market structures. Insights into subindustries, segments, categories, and micromarkets are the building blocks of portfolio choice. Companies will find this approach to growth indispensable in making the right decisions about where to compete.[29]

80.     Additionally, McKinsey encouraged a granular assessment of the geography of corporate growth. "The story gets more precise as we disaggregate the company's performance on the three growth drivers in 12 product categories for five geographic regions."[30]

81.     One can imagine this strategy applied to a seller of, say, cartons of milk. If McKinsey were to perform an analysis of the milk seller's sales and marketing and discovers that the profit margin on milk cartons sold to university cafeterias in dairy-producing states is much greater than the margin on cartons sold at convenience stores in the southwest, and further that the milk seller has previously devoted equal amounts of time and resources selling to both university cafeterias and convenience stores; then McKinsey would likely advise the client to deploy additional resources towards selling milk to university cafeterias in dairy-producing states. McKinsey's "granular" approach to the milk seller's business channels has identified a way to increase higher margin sales, leading to newfound growth for the client.

---

[28] *The granularity of growth*, Book Excerpt, McKinsey & Co. (Mar. 1, 2008), https://www.mckinsey.com/business-functions/strategy-and-corporate-finance/our-insights/the-granularity-of-growth.

[29] Mehrdad Baghai et al., *The granularity of growth*, McKinsey Q. (May 1, 2007), https://www.mckinsey.com/featured-insights/employment-and-growth/the-granularity-of-growth.

[30] *Id.*

82.    Rather than milk, McKinsey deployed this strategy on OxyContin, a controlled substance, after its manufacturer pled guilty to misrepresenting the addictive and deadly properties of the drug.

### 2.    "Identifying Granular Growth Opportunities for OxyContin"

83.    McKinsey's granular analysis of Purdue's OxyContin sales efforts led to the implementation of a number of strategies to sell more pills.

84.    By January 2010, McKinsey informed Purdue that, in accordance with the tenants of its granular growth analysis, Purdue could generate "$200,000,000 to $400,000,000" in additional annual sales of OxyContin by implementing McKinsey's strategies.

85.    In June 2012, Stewart assigned McKinsey to "understand the significance of each of the major factors affecting OxyContin's sales."

86.    McKinsey did this in excruciatingly granular detail, analyzing each sales channel for Purdue's opioids for weaknesses and opportunities. For instance, McKinsey informed the Sacklers that "deep examination of Purdue's available marketing purchasing data shows that Walgreens has reduced its units by 18%." Further, "the Walgreens data also shows significant impact on higher OxyContin doses." In order to counter these perceived problems, McKinsey suggested that Purdue's owners lobby Walgreens specifically to increase sales. It also suggested the establishment of a direct-mail specialty pharmacy so that Purdue could circumvent Walgreens and sell directly to Walgreens' customers. In addition, McKinsey suggested the use of opioid savings cards distributed in neighborhoods with Walgreens locations to encourage the use of Purdue's opioids despite Walgreens' actions.

87.    The themes of McKinsey's work would be crystallized in a series of presentations and updates made to the Sackler family and Purdue's Board in the summer of 2013 entitled, "Identifying Granular Growth Opportunities for OxyContin."

### a.    Marketing – Countering Emotional Messages

88.    From the outset of McKinsey's known work for Purdue, the work was grim. In June 2009, McKinsey teamed with Purdue's CMO (and current CEO) Landau and his staff to discuss

1   how best to "counter emotional messages from mothers with teenagers that overdosed in [sic]

2   OxyContin."

3          89.     Months later, McKinsey advised Purdue to market OxyContin based on the false

4   and misleading notion that the drug can provide "freedom" and "peace of mind" for its users, and

5   concomitantly reduce stress and isolation.

6          90.     These marketing claims were tailored to avoid any pitfalls that the Agreement

7   might hold. While nonetheless false and misleading, these claims regarding "freedom" and "peace

8   of mind" of OxyContin users were narrowly tailored in order to avoid representations regarding

9   "the withdrawal, drug tolerance, drug addiction or drug abuse of Purdue's products," as specified

10  in Section III.B.2.c of the Agreement.

11         91.     Purdue's marketing materials from that time period are illustrative of the

12  approach:[31]

13



27  ────────────────
    [31]  *Tennessee v. Purdue Pharma L.P.*, No. 1-173-18, Complaint at ¶24 (Tenn. Cir. Ct. May 15,

28  2018).

92. In addition, McKinsey suggested the tactic of "patient pushback," wherein McKinsey and Purdue would foment *patients* to directly lobby their doctors for OxyContin when those physicians expressed reservations regarding the administration of Purdue's opioids.

        **b.**     **Targeting – Selling More OxyContin to Existing High Prescribers**

93. Perhaps the key insight McKinsey provided was, using its granular approach, to identify historically large prescribers and target ever more sales and marketing resources on them.

94. On January 20, 2010, Purdue's Board was informed of the ongoing work McKinsey was performing concerning a new "physician segmentation" initiative whereby McKinsey would analyze the opioid prescribing patterns of individual physicians to identify those that had historically been the highest prescribers. McKinsey then worked with Purdue's sales and marketing staff to specifically target those prescribers with a marketing blitz to encourage even further prescribing.

95. Purdue trained its sales force in tactics to market to these high prescribers based on McKinsey's insights and designed in conjunction with McKinsey.

96. Many of the historically highest prescribers of OxyContin – those same individuals that McKinsey urged Purdue to target for ever more prescriptions – had prescribed Purdue's OxyContin *before* the 2007 guilty plea, and had already been subjected to Purdue's misrepresentations regarding OxyContin that were the subject of that guilty plea.

97. McKinsey identified these physicians – those that had already been influenced by Purdue's misrepresentations and were, thus, already high prescribers – as optimal targets for a massive marketing push to sell more OxyContin.

98. McKinsey worked assiduously with Purdue over many years to continually refine this approach, and required ever-more granular data for its analysis. More than three years after the initial introduction of the physician segmentation initiative, McKinsey requested, and Purdue provided "prescriber-level milligram dosing data" so that they could further analyze the individual amounts of OxyContin prescribed by individual physicians.

99.     At the same time, it requested this "prescriber-level milligram dosing data" from Purdue, McKinsey urged the Sacklers to strictly manage the target lists of each sales representative to assure that the maximum amount of each sales representative's time was spent with the most attractive customers.

100.     On July 23, 2013, Purdue's Board discussed concerns about "the decline in higher strengths" of Purdue's opioids as well as an observed decline in "tablets per Rx." In order to assure that the threat to OxyContin sales growth be addressed, McKinsey was assigned "to actively monitor the number and size of opioid prescriptions written by individual doctors."

101.     In the unveiling of *Project Turbocharge* to Purdue and the Sacklers, McKinsey stated that the most prolific OxyContin prescribers wrote "25 times as many OxyContin scripts" as less prolific prescribers, and urged Purdue and the Sacklers to "make a clear go-no-go decision to 'Turbocharge the Sales Engine'" by devoting substantial capital toward McKinsey's plan.

102.     McKinsey also stated that increased numbers of visits by sales representatives to these prolific prescribers would increase the number of opioid prescriptions that they would write.

103.     By November 2013, McKinsey had obtained the physician-level data they had previously requested, and continued to study ways to sell additional OxyContin prescriptions by refining and targeting the sales pitch to them. Purdue's Board was kept apprised of McKinsey's progress.

### c.     Titration – Selling Higher Doses of OxyContin

104.     McKinsey understood that the higher the dosage strength for any individual OxyContin prescription, the greater the profitability for Purdue. Of course, higher dosage strength, particularly for longer periods of use, also contributes to opioid dependency, addiction, and abuse. Nonetheless, McKinsey advised Purdue to focus on selling higher strength dosages of OxyContin.

105.     Consistent with its granular growth analysis, as early as October 26, 2010 McKinsey advised the Sacklers and the Purdue Board that Purdue should train its sales representatives to "emphasiz[e] the broad range of doses," which would have the intended effect of increasing the sales of the highest (and most profitable) doses of OxyContin.

106.    McKinsey's work on increasing individual prescription dose strength continued throughout the time period McKinsey worked with Purdue. The Sacklers were informed on July 23, 2013, that Purdue had identified weakness in prescribing rates among the higher doses of OxyContin, and reassured the Sacklers that "McKinsey would analyze the data down to the level of individual physicians" in order to study ways to maximize the sales of the highest-dose OxyContin pills.

107.    Purdue implemented McKinsey's suggestions through adopting the marketing slogan to "Individualize the Dose," and by 2013 encouraged its sales representatives to "practice verbalizing the titration message" when selling Purdue's opioids to prescribers.

### d.    Covered Persons – Sales Quotas and Incentive Compensation

108.    McKinsey urged the use of quotas and bonus payments to motivate the sales force to sell as many OxyContin prescriptions as possible.

109.    Notably, this behavior was contemplated by the 2007 Agreement, which required Purdue to implement written policies regarding "compensation (including salaries and bonuses) for [sales representatives] engaged in promoting and selling Purdue's products that are designed to ensure that financial incentives *do not inappropriately motivate such individuals to engage in the improper promotion or sales of Purdue's products*." (emphasis added).

110.    By 2010, Purdue had implemented a four-year plan, consistent with McKinsey's strategy, to dramatically increase the quota of required annual sales visits by Purdue sales representatives to prescribers. The quota was 545,000 visits in 2010; 712,000 visits in 2011; 752,000 in 2012; and 744,000 visits in 2013.

111.    On August 8, 2013, as part of their "Identifying Granular Growth Opportunities for OxyContin" presentation, McKinsey urged the Sacklers to "establish a revenue growth goal (*e.g.*, $150M incremental stretch goal by July 2014) and set monthly progress reviews with CEO and Board."

112.    In its "Identifying Granular Growth Opportunities for OxyContin" presentation to the Purdue Board in July 2013, McKinsey, nonetheless, urged Purdue, in addition to increasing

the focus of the sales force on the top prescribers, to also increase the overall quotas for sales visits for individual sales representatives from 1,400 to 1,700 annually.

113.    In 2013, McKinsey identified one way that Purdue could squeeze more productivity out of its sales force: by slashing *one third* of the time that Purdue devoted to training its sales force (from 17.5 days per year to 11.5 days per year):

**One possible way to attain benchmark ~1500 calls per year is to decrease training days by ~6 days and increase calls per day by 5%**   One possible route to benchmark

| Current call activity | | Potential new allocation | |
|---|---|---|---|
| **Number of "on territory" days per year** | | **Number of "on territory" days per year** | |
| Item | Days¹ | Item | Days¹ |
| Number of working days | 260 | Number of working days | 260 |
| Holidays | -11.3 | Holidays | -11.3 |
| Vacation and other time off | -27.2 | Vacation and other time off | -27.2 |
| Trainings and meetings | -17.5 | Trainings and meetings | -11.5 |
| Other company-related time off of field | -4.3 | Other company-related time off of field | -4.3 |
| Total days | 199.7 | Total days | 205.7 |
| Avg calls per day | x      7 | Avg calls per day | x      7.35 |
| Total calls per year | 1398 | Total calls per year | 1512 |

1 Purdue 2012 Actual data was used for this analysis

SOURCE: Purdue: team analysis

McKinsey & Company  |  59

114.    By eliminating one third of the amount of time sales representatives were required to be in training, McKinsey projected that Purdue could squeeze an additional 5% of physical calls per day out of its newly less-trained sales force.

115.    Additionally, McKinsey advised Purdue on how to craft incentive compensation for the sales representatives, who were Covered Persons pursuant to the Agreement. McKinsey knew that, combined with the strictures of sales quotas and less training for the sales force, bonus/incentive compensation to the sales representatives based on the number of OxyContin prescriptions the representative produced could be a powerful driver of incremental OxyContin sales.

**e.    Increasing the Overall Size of the Opioid Market: the Larger the Pie, the Larger the Slice**

116.    Consistent with McKinsey's mandate, Purdue incentivized its sales staff "to increase not just sales of OxyContin but also generic versions of extended release oxycodone." Typically, one would not wish to encourage the sales of generic competitors that offer a similar product to your own. If, however, your goal is to position a company so as to look like an attractive acquisition target, the growth of the overall opioid market is just as important as one's own market share: "Whereas pharma salespeople are usually compensated based on their ability to grow sales of a particular medicine, part of the bonus for Purdue's staff was calculated in relation to the size of the overall market."[32]

117.    Notably, this notion that the size of a company's market share is not as important as the size of the **_overall_** market in which it competes is a core insight of McKinsey's granular approach to identifying corporate growth opportunities. Describing their authors' conclusions in *The Granularity of Growth*, McKinsey stated, "One of their most surprising conclusions is that increased market-share is seldom a driver of growth. They contend, instead, that growth is driven by where a company chooses to compete: which market segments it participates in … [t]he key is to focus on granularity, to breakdown big-picture strategy into its smallest relevant components."[33]

118.    In other words, "Purdue's marketing force was indirectly supporting sales of millions of pills marketed by rival companies."[34] "It's the equivalent of asking a McDonald's store manager to grow sales of Burger King and KFC," stated a government official with the HHS.[35] McKinsey designed this plan.[36]

---

[32]    *See* David Crow, *supra* note 14.

[33]    *The granularity of growth*, *supra* note 28.

[34]    *See* David Crow, *supra* note 14.

[35]    *Id*.

[36]    Worth noting is that this strategy of increasing overall opioid sales directly benefitted the Sacklers through their ownership of Rhodes *See infra*, ¶35. Especially worth noting is that this strategy also benefitted McKinsey's other opioid clients, such as Johnson and Johnson. *See infra*, ¶145. "They have a huge amount of inside information, which raises serious conflict issues at

**F.      Transformation: Purdue Implements McKinsey's Strategies**

119.     As early as September 11, 2009, McKinsey told Purdue that it could generate $200 million to $400 million in additional annual sales of OxyContin by implementing McKinsey's strategy based on the opportunities its granular growth analysis had identified. McKinsey reiterated its assurances regarding the hundreds of millions of dollars of additional OxyContin sales on January 20, 2010.

120.     Purdue accepted and, with McKinsey's ongoing assistance, implemented McKinsey's strategies for selling and marketing OxyContin.

121.     For instance, in January 2010, Purdue was training its sales and marketing force on the new sales tactics based on a "physician segmentation" initiative that McKinsey urged. The strategy developed as a result of McKinsey's granular analysis of OxyContin sales channels. The initiative sought to identify the most prolific OxyContin prescribers and then devote significant resources towards convincing those high prescribers to continue to prescribe ever more OxyContin, in higher doses, for longer times, to ever more patients.

122.     On January 20, 2010, the Purdue Board was informed of the progress in implementing McKinsey's "physician segmentation" initiative.

123.     This collaboration would continue over the course of the relationship between Purdue and McKinsey.

124.     During the time that McKinsey was advising Purdue, Purdue deliberately minimized the importance of the Agreement. In 2008, Carol Panara ("Panara") joined the Purdue

---

multiple levels," stated a former consultant, referring to McKinsey's influential role as advisor to multiple participants in a given industry, such as opioid manufacturing. It "puts them in a kind of oligarchic position." Michelle Celarier, *The Story McKinsey Didn't Want Written*, INSTITUTIONAL INV. (July 8, 2019), https://www.institutionalinvestor.com/article/b1g5zjdcr97k2y/The-Story-McKinsey-Didn-t-Want-Written.

For example, in an August 15, 2013 presentation to Purdue management entitled, "Identifying OxyContin Growth Opportunities," McKinsey noted that "McKinsey's knowledge *of the ways other pharma companies operate* suggests Purdue should reassess the roles of MSL and HECON Groups – and further drive the salesforce to be more responsive to formulary coverage changes." (emphasis added).

1  sales force from rival Novartis. Panara would stay with the company until 2013, during which time

2  McKinsey was responsible for increasing OxyContin sales at Purdue, and culminating with the

3  implementation of McKinsey's "Project Turbocharge," beginning September 2013.

4       125.    Panara stated that the 2007 guilty plea was deliberately minimized by the company

5  in presentations to its sales staff: "They said, 'we were sued, they accused us of mis-marketing,

6  but that wasn't really the case. In order to settle it and get it behind us we paid a fine.' You had the

7  impression they were portraying it as a bit of a witch hunt."[37] (Purdue and its executives paid

8  $634.5 million in fines.)

9       126.    Consistent with McKinsey's mandate, McKinsey devised methods for sales staff to

10 sell OxyContin to doctors while at the same time maintaining technical compliance with the

11 Agreement: Panara stated that, though she was told she could not flatly claim that OxyContin was

12 better or safer than other opioids, "she was trained to talk about products in ways that implied that

13 it was safer." Panara might tout OxyContin's 12-hour formulation to a prescriber: "You could say

14 that with a shorter-acting medication that wears off after six hours, there was a greater chance the

15 patient was going to jump their dosing schedule and take an extra one a little earlier. We couldn't

16 say [it was safer], but I remember we were told that doctors are smart people, they're not stupid,

17 they'll understand, they can read between the lines."[38]

18                        **1.    Project Turbocharge**

19      127.    In 2013, the year after the Agreement expired, McKinsey urged a number of

20 transformational sales and marketing tactics that would further boost OxyContin sales. McKinsey

21 described these tactics to the Purdue Board in a series of updates entitled, "Identifying Granular

22 Growth Opportunities for OxyContin" in July and August 2013.

23      128.    McKinsey dubbed their overall sales and marketing strategy for Purdue "Project

24 Turbocharge," and urged the Sackler family and the Board to adopt it. Specifically, McKinsey

25 urged the Board to "make a clear go-no go to 'Turbocharge the Sales Engine.'"

26 _____

27 [37]  *See* David Crow, *supra* note 14.

28 [38]  *Id.*

COMPLAINT -                                                                                        - 27 -
4873-1648-5695.v1

129.    The Sacklers were impressed with McKinsey's work. On August 15, 2013, Richard Sackler emailed Mortimer D.A. Sackler, "the discoveries of McKinsey are astonishing."

130.    Eight days later, on August 23, 2013, McKinsey partners met with the Sackler family – not the Purdue Board – in order to pitch Project Turbocharge. Dr. Arnab Ghatak ("Ghatak"), one of the McKinsey partners leading the Purdue account, recounted the meeting to fellow partner Elling in an email exchange: "[T]he room was filled only with family, including the elder statesman Dr. Raymond [Sackler] . . . We went through exhibit by exhibit for about 2 hrs . . . They were extremely supportive of the findings and our recommendations . . . and wanted to strongly endorse getting going on our recommendations."

131.    Elling, a co-leader of the Purdue account, remarked in the same email correspondence that McKinsey's "findings were crystal clear to" the Sacklers, and that the Sacklers "gave a ringing endorsement of 'moving forward fast.'"

### 2.    Evolve to Excellence

132.    As a result of the Sackler family endorsement of McKinsey's proposals, the following month Purdue implemented Project Turbocharge based on McKinsey's recommendations. In adopting "Project Turbocharge," Purdue acknowledged the improper connotations of the name, and re-christened the initiative with a name decidedly more anodyne, "E2E: Evolve to Excellence."[39]

133.    "Evolve 2 Excellence" was the theme of Purdue's 2014 National Sales Meeting.

134.    Stewart also told sales staff that Board member Paolo Costa was a "champion for our moving forward with a comprehensive 'turbocharge' process," referring to McKinsey's plan.

135.    After Purdue adopted McKinsey's recommendations, McKinsey continued to work with Purdue sales and marketing staff reporting to Gasdia during Purdue's implementation of McKinsey's recommendations.

---

[39]    Regarding the name change, Stewart wrote to McKinsey partners Rosiello and Ghatak on August 15, 2013: "Paolo Costa was especially engaged in the discussion and he (among others) will be a champion for our moving forward with a comprehensive 'turbocharge' process – *though we do need to find a better and more permanently appropriate name*." (emphasis added).

136.    In fact, the entire E2E initiative was overseen by McKinsey and some Purdue executives, who together comprised the E2E Executive Oversight Team and Project Management Office.

137.    At the same time, the Sacklers were kept informed of the implementation of McKinsey's OxyContin strategy. According to a September 13, 2013 Board agenda, the Board discussed with the Sacklers the ongoing implementation of McKinsey's sales tactics.

138.    McKinsey's Project Turbocharge, now re-named E2E, called for a **_doubling_** of Purdue's sales budget. Under McKinsey's prior tutelage, Purdue's promotional spending had already skyrocketed. McKinsey's influence on Purdue's operations after the 2007 guilty plea is stark:



139.    At the time of McKinsey's first known work for Purdue, Purdue spent approximately $5 million per quarter on sales and marketing. By the time McKinsey's Project Turbocharge had been implemented, total quarterly sales and marketing spending at Purdue exceeded $45 million per quarter, an increase of **_800%_**.

140.    Project Turbocharge continued despite the arrival of a new CEO at Purdue. On January 17, 2014, new CEO Mark Timney ("Timney") received reports from McKinsey emphasizing that, in order to increase profits, Purdue must again increase the number of sales visits to "high-value" prescribers, *i.e.*, those that prescribe the most OxyContin.[40]

141.    McKinsey also urged, consistent with their granular approach, that sales representatives devote two-thirds of their time to selling OxyContin and one-third of their time selling Butrans, another Purdue product. Previously, the split had been 50-50.

142.    Purdue implemented McKinsey's suggestion.

**G.    McKinsey's Efforts Triple OxyContin Sales**

143.    Purdue got what it wanted out of McKinsey. Between 2008 through 2016, Purdue distributed in excess of $4 billion to the Sackler family, with $877 million distributed in 2010 alone.

144.    These distributions would not have been possible without McKinsey's work of dramatically increasing OxyContin sales.

145.    The Sacklers were aware of the value McKinsey provided: on December 2, 2013, Stewart informed Dr. Kathe Sackler and Vice President of Sales and Marketing Gasdia that Project Turbocharge "was already increasing prescriptions and revenue." Crucially, these results were already being realized ***before*** the strategy was fully deployed as the theme of the 2014 National Sales Meeting.

---

[40]    In fact, recent deposition testimony suggests McKinsey may have even been responsible for the fact that Timney was given the CEO job at Purdue in the first place. On October 30, 2020, Timney provided the following testimony:

Q:    Are you familiar with McKinsey & Company?

A: I decline to answer on the ground that I may not be compelled to be a witness against myself in any proceeding.

Q: Did individuals at McKinsey ***assist you in getting hired as the CEO*** of Purdue?

A: I decline to answer on the ground that I may not be compelled to be a witness against myself in any proceeding. (emphasis added).

146.    McKinsey's contributions to Purdue's growth after 2007 are remarkable. OxyContin sales should have naturally declined: the United States Department of Justice ("DOJ") identified OxyContin sales that were illegitimate because of Purdue's conduct, and the Inspector General of the HHS entered into an Agreement whereby Purdue was monitored to assure that those sales did not continue.

147.    In 2007, the year of Purdue's guilty plea, net sales of OxyContin totaled approximately $1 billion.[41]

148.    The guilty plea "did little to stem Purdue's blistering growth rate." In fact, by 2010, after McKinsey was advising Purdue on how to maximize sales, OxyContin sales exceeded $3 billion: a *tripling* of revenue from OxyContin sales.[42]

149.    Under McKinsey's guidance, OxyContin would reach their all-time peak in 2013, the year McKinsey proposed, and Purdue adopted, Project Turbocharge.[43] That OxyContin sales peaked in 2013 is especially notable, given that *overall* opioid prescriptions had *already peaked* three years earlier, in 2010.[44] McKinsey's efforts added a final boost to OxyContin sales before the eventual unraveling, and Purdue's decision, in the end, to cease marketing the drug.

150.    By 2018, with OxyContin sales in their inexorable decline, Purdue announced that it would cease sending sales representatives to healthcare providers to promote OxyContin. The ranks of sales representatives were cut back to 200 people – the approximate size of Purdue's sales staff prior to the initial launch of OxyContin.

---

[41]   *See* David Crow, *supra* note 14.

[42]   *Id.*

[43]   Phil McCausland & Tracy Connor, *OxyContin maker Purdue to stop promoting opioids in light of epidemic*, NBC NEWS (Feb. 10, 2018), https://www.nbcnews.com/storyline/americas-heroin-epidemic/oxycontin-maker-purdue-stop-promoting-opioids-light-epidemic-n846726.

[44]   Gery P. Guy Jr,. et al., *Vital Signs: Changes in Opioid Prescribing Patterns in the United States, 2006-2015*, CDC, MORB. MORTAL WKLY. REP. (July 7, 2017), https://www.cdc.gov/mmwr/volumes/66/wr/mm6626a4.htm.

1     151.   In 2014, according to Purdue, there were 5.4 million OxyContin prescriptions

2 written, 80% for twelve-hour dosing. Of those prescriptions, more than half were for doses greater

3 than 60 milligrams per day.

4       **H.**     **Tolling of Statutes of Limitations**

5           **1.**     **Equitable Estoppel and Fraudulent Concealment**

6     152.   McKinsey is equitably estopped from relying upon a statute of limitations defense

7 because, alongside Purdue, McKinsey undertook active efforts to deceive Plaintiff and to

8 purposefully conceal their unlawful conduct and fraudulently assure the public and Plaintiff that

9 they were undertaking efforts to comply with their obligations under the state and federal

10 controlled substances laws, all with the goal of protecting their registered manufacturer or

11 distributor status in the state of California and to continue generating profits. Notwithstanding the

12 allegations set forth above, McKinsey and Purdue affirmatively assured the public and Plaintiff

13 that they were working to curb the opioid epidemic.

14     153.   McKinsey and Purdue were deliberate in taking steps to conceal their conspiratorial

15 behavior and active role in the deceptive marketing and the oversupply of opioids through

16 overprescribing and suspicious sales, all of which fueled the opioid epidemic.

17     154.   McKinsey's consulting services were given confidentially, and both McKinsey and

18 Purdue concealed the content of those services from the public.

19     155.   McKinsey and Purdue also concealed from Plaintiff the existence of Plaintiff's

20 claims by hiding their lack of cooperation with law enforcement and affirmatively seeking to

21 convince the public that Purdue's legal duties to report suspicious sales had been satisfied through

22 public assurances that they were working to curb the opioid epidemic. They publicly portrayed

23 themselves as committed to working diligently with law enforcement and others to prevent

24 diversion of these dangerous drugs and curb the opioid epidemic, and they made broad promises

25 to change their ways insisting they were good corporate citizens. These repeated

26 misrepresentations misled regulators, prescribers, and the public, including Plaintiff, and deprived

27 Plaintiff of actual or implied knowledge of facts sufficient to put Plaintiff on notice of potential

28 claims.

156.   Plaintiff did not discover the nature, scope, and magnitude of McKinsey's misconduct, and its full impact on Plaintiff, and could not have acquired such knowledge earlier through the exercise of reasonable diligence.

157.   Purdue and McKinsey's campaign to misrepresent and conceal the truth about the opioid drugs that they were aggressively pushing on Plaintiff deceived the medical community, consumers, and Plaintiff.

158.   Further, Purdue and other opioid manufacturers also concealed and prevented discovery of information, including data from the ARCOS database.

159.   McKinsey intended that its actions and omissions made with Purdue would be relied upon, including by Plaintiff. Plaintiff did not know and did not have the means to know the truth, due to McKinsey's and Purdue's actions and omissions.

160.   Plaintiff reasonably relied on McKinsey's and Purdue's affirmative statements regarding their purported compliance with their obligations under the law and consent orders.

### 2.   McKinsey and Purdue Persisted in the Fraudulent Scheme Despite a Guilty Plea and Large Fine

161.   In May 2007, Purdue and three of its executives pled guilty to federal charges of misbranding OxyContin in what the company acknowledged was an attempt to mislead doctors about the risk of addiction. Purdue was ordered to pay $600 million in fines and fees. In its plea, Purdue admitted that its promotion of OxyContin was misleading and inaccurate, misrepresented the risk of addiction, and was unsupported by science. Additionally, Michael Friedman, the company's president, pled guilty to a misbranding charge and agreed to pay $19 million in fines; Howard R. Udell, Purdue's top lawyer, also pled guilty and agreed to pay $8 million in fines; and Paul D. Goldenheim, its former medical director, pled guilty as well and agreed to pay $7.5 million in fines.

162.   Nevertheless, even after the settlement, Purdue continued to pay doctors on speakers' bureaus to promote the liberal prescribing of OxyContin for chronic pain and fund seemingly neutral organizations to disseminate the message that opioids were non-addictive, as well as other misrepresentations. At least until early 2018, Purdue continued to deceptively market

1   the benefits of opioids for chronic pain while diminishing the associated dangers of addiction.

2   After Purdue made its guilty plea in 2007, it assembled an army of lobbyists to fight any legislative

3   actions that might encroach on its business. Between 2006 and 2015, Purdue and other painkiller

4   producers, along with their associated nonprofits, spent nearly $900 million dollars on lobbying

5   and political contributions – eight times what the gun lobby spent during that period. McKinsey

6   participated extensively in these actions and provided Purdue with strategies and assistance to

7   maximize sales as described in this Complaint.

8       163.   As all of the government actions against the Purdue and McKinsey demonstrate,

9   McKinsey knew that the actions it took with Purdue were unlawful, and yet deliberately proceeded

10  in order to increase Purdue's sales and profits, and, in turn, to serve McKinsey's financial interests.

11      **I.    McKinsey Knew**

12      164.   McKinsey has long maintained a Pharmaceuticals and Medical Products ("PMP")

13  industry practice group dedicated to working with pharmaceutical companies. In 2003, when

14  McKinsey's relationship with Purdue began, the PMP group was led by Michael Pearson

15  ("Pearson"). Pearson worked for McKinsey for 23 years and was a member of the firm's

16  shareholder council (McKinsey's equivalent of a Board) in addition to leading PMP before

17  departing McKinsey in 2008 to helm Valeant Pharmaceuticals.[45]

18      165.   Pearson stated, "At McKinsey pharmaceuticals was one of our biggest industry

19  groups."[46] Pearson was "not the quintessential suave and intellectual McKinsey partner. He was

20  loud and profane and was seen, in the words of one former colleague, as 'sharp-edged and sharp

21  elbowed.'"[47]

22

23  [45]  John Gapper, *McKinsey's fingerprints are all over Valeant*, FIN. TIMES (Mar. 23, 2016),
    https://www.ft.com/content/0bb37fd2-ef63-11e5-aff5-19b4e253664a.

24      Notably, Rosiello, a McKinsey partner who was a co-lead of the Purdue account, went on to
25  join Pearson at Valeant Pharmaceuticals in 2015 as CFO.

26  [46]  Michael Peltz, *Mike Pearson's New Prescription for the Pharmaceuticals Industry*,
    INSTITUTIONAL INV. (Sept. 3, 2014), https://www.institutionalinvestor.com/article/
27  b14zbjfm8nf1c4/mike-pearsons-new-prescription-for-the-pharmaceuticals-industry.

28  [47]  John Gapper, *supra* note 45.

COMPLAINT -                                                                         - 34 -
4873-1648-5695.v1

166.    Under his leadership, McKinsey's knowledge and expertise in the pharmaceutical industry was significant. By 2009, McKinsey described its capabilities: "We have an unparalleled depth of both functional and industry expertise as well as breadth of geographical reach. Our scale, scope, and knowledge allow us to address problems that no one else can. At heart, we are a network of people who are passionate about taking on immense challenges that matter to leading organizations, and often, to the world."

167.    In 2012, while advising Purdue, McKinsey described its health care capabilities thusly: "Indeed, there is a doctor in the house. We have more than 1,700 consultants with significant healthcare experience, including more than 150 physicians and 250 consultants with advanced degrees in genetics, immunology, biochemical engineering, neurobiology, and other life sciences. We also have 75 consultants with advanced degrees in public health, healthcare management, and related fields."

168.    By the time McKinsey was working with Purdue on sales and marketing in 2009, it already had extensive experience with opioids in particular. As early as 2002, McKinsey was advising other opioid manufacturers regarding methods to boost sales of their drugs. For example, on March 14, 2002, McKinsey prepared a confidential report for Johnson & Johnson regarding how to market their opioid Duragesic. Incredibly, one of the recommendations McKinsey provided to Johnson & Johnson was that they concentrate their sales and marketing efforts on doctors that were *already* prescribing large amounts of Purdue's OxyContin.[48]

169.    As early as 2002 McKinsey had such intricate knowledge of the sales and marketing practices of opioid manufacturers, generally, and Purdue's efforts with OxyContin, specifically, that it was able to recommend to *a competitor of Purdue* that it boost its own opioid sales by *following in the footsteps of Purdue*.

170.    What is more, on September 13, 2013 McKinsey briefed Purdue on the ongoing concerns regarding OxyContin addiction and diversion among prescribers:

---

[48]    Chris McGreal, *Johnson & Johnson faces multibillion opioids lawsuit that could upend big pharma*, GUARDIAN (June 23, 2019), https://www.theguardian.com/us-news/2019/jun/22/johnson-and-johnson-opioids-crisis-lawsuit-latest-trial.

1
2
3
4
5
6
7
8
9
10
11
12



**Findings on messaging and positioning**                                          |PRELIMINARY

- Opioids overall are still viewed as effective and necessary class of painkillers, though side effects and addiction are concerns
- Key themes from prescriber interviews on abuse deterrents include:
  – Prescriber awareness of abuse deterrence and label change is mixed
  – Opinions on impact/efficacy of abuse deterrence vary
  – Most prescribers are concerned about abuse, but attempt to establish measures to protect themselves
  – Concerns remain that technology does not address oral abuse
  – Less informed prescribers ask for additional information and education around abuse deterrent formulations
- Existing market research suggests that most physicians do not feel that reformulation positively impacts their prescribing behavior, and that diversion, abuse and regulatory concerns continue to weigh on prescribers

McKinsey & Company | 27

13    171.    In a PowerPoint slide entitled, "Findings on messaging and positioning," part of a

14  presentation to Purdue entitled, "OxyContin growth opportunities: Phase 1 Final Report:

15  Diagnostic," McKinsey noted that "most prescribers are concerned about abuse," and that "most

16  physicians do not feel that [OxyContin] reformulation positively impacts their prescribing

17  behavior, and that diversion, abuse and regulatory concerns continue to weigh on prescribers."

18    172.    Indeed, one reason that **Purdue** had knowledge that their own products were

19  addictive and dangerous is because McKinsey told them.

20    173.    In February 2009, only months prior to McKinsey's first known work for Purdue,

21  Dr. Art Van Zee ("Van Zee"), in his peer-reviewed article in the American Journal of Public Health

22  entitled, "The promotion and Marketing of OxyContin: Commercial Triumph, Public Health

23  Tragedy," stated the matter plainly: "***Compared with noncontrolled drugs, controlled drugs, with***

24  ***their potential for abuse and diversion, pose different public health risks when they are***

25
26
27
28

1   *overpromoted and highly prescribed*." (emphasis added). By 2004, "OxyContin had become the

2   most prevalent prescription opioid abused in the United States."[49]

3   174.   Further, Van Zee identified the *precise tactics* that McKinsey deployed for Purdue

4   as a source of OxyContin misuse and abuse, and suggested that regulation may be appropriate to

5   curtail its use: "The use of prescriber profiling data to target high-opioid prescribers – coupled

6   with very lucrative incentives for sales representatives – would seem to fuel increased prescribing

7   by some physicians – perhaps the most liberal prescribers of opioids and, in some cases, the least

8   discriminate."[50]

9   175.   Of course, to argue that McKinsey had contemporaneous knowledge of the fact that

10  increasing OxyContin sales create ever more addiction and misuse in some ways misses the point.

11  It disregards the context in which McKinsey was operating after 2009: advising a monoline

12  manufacturer of opioids about sales and marketing practices for its addictive products while that

13  manufacturer is bound by a five-year Agreement covering the very same opioid sales and

14  marketing practices. In 2012, OxyContin accounted for 94% of Purdue's revenue.[51] As late as

15  2018, it remained 84% of Purdue's revenue.[52]

16  176.   McKinsey's mandate was to increase Purdue's opioid sales during a time when

17  Purdue was obligated to restrict its previous marketing strategies because those strategies had

18  caused the *overprescribing of opioids* and the inevitable consequences thereof. McKinsey's job

19  was to counter the intended results of the Agreement; to devise strategies to sell as many pills as

20  conceivably possible. Under McKinsey's tutelage, Purdue's growth continued its upward

21  trajectory unabated, the Agreement notwithstanding.

22

23

---

24  [49]  Art Van Zee, *The Promotion and Marketing of OxyContin: Commercial Triumph, Public
    Health Tragedy*, 99 Am. J. Pub. Health 221, 221, 224 (Feb. 2009),
25  https://www.ncbi.nlm.nih.gov/pmc/articles/PMC2622774/pdf/221.pdf.

26  [50]  *Id.*

27  [51]  Gerald Posner, *Pharma: Greed, Lies, and the Poisoning of America*, 524 (2020).

28  [52]  *Id.*

177.    If McKinsey was not aware of the adverse consequences of OxyContin, the drug it was paid to sell, such ignorance could not survive the granular reality of its relationship with Purdue. As early as June 2009, McKinsey's work consisted of "countering the emotional messages from mothers with teenagers that overdosed on OxyContin."

178.    Another indication that OxyContin sales should not be turbocharged: during McKinsey's work for Purdue, Purdue was unable to purchase product liability insurance to cover its practice of selling OxyContin.

179.    McKinsey's method of aggressive marketing of opioids to prescribers has demonstrably exacerbated the opioid crisis. A recent Journal of American Medical Association study analyzed the Centers for Medicare and Medicaid Services' Open Payments database regarding pharmaceutical company marketing efforts towards doctors, as well as Centers for Disease Control and Prevention data on prescription opioid overdose deaths and prescribing rates, in order to assess whether pharmaceutical marketing of opioids to physicians affected the rate of prescription opioid overdose deaths. Notably, the study analyzed these marketing practices beginning August 1, 2013 and ending December 31, 2015.[53]

180.    These dates are significant, as the study captures the same timeframe that McKinsey's Project Turbocharge was implemented at Purdue.

181.    The study noted "physician prescribers are the most frequent source of prescription opioids for individuals who use opioids nonmedically."[54]

182.    The study found that "increased county-level opioid marketing was associated with elevated overdose mortality 1 year later, an association mediated by opioid prescribing rates; per

---

[53]    Scott E. Hadland et al., *Association of Pharmaceutical Industry Marketing of Opioid Products With Mortality From Opioid-Related Overdoses*, 2 JAMA NETWORK 1 (Jan. 18, 2019), https://jamanetwork.com/journals/jamanetworkopen/fullarticle/2720914.

[54]    *Id.*

capita, *the number of marketing interactions with physicians demonstrated a stronger association with mortality* than the dollar value of marketing."[55] (emphasis added).

### J.    Coda

183.    Marvin Bower ("Bower"), a founding father of McKinsey and managing director of the firm from 1950 to 1967, instilled an ethos at McKinsey that has been reinforced throughout the decades as a core value of the firm: "Deliver bad news if you must, but deliver it properly."[56]

184.    McKinsey's work with Purdue, which began just after his death in 2003, would have been unrecognizable to Bower, one of the founders of modern management consulting. Instead of acknowledging the elephant in the room – that Purdue's business was knowingly maximizing the amount of addictive and deadly opioids sold in the United States – and delivering that bad news properly to the client, McKinsey instead committed to partner with Purdue to maximize opioid sales, the torpedoes be damned.

185.    On October 23, 2017, the president of the United States declared the ongoing nationwide opioid epidemic a "public health emergency." Even at this late hour in the crisis, McKinsey continued to propose solutions to the Sacklers and Purdue to further boost opioid sales. These solutions were fashioned, in perfect McKinsey parlance, as "high impact interventions to rapidly address market access challenges."

186.    Less than two months after the public health emergency declaration, McKinsey proposed these high impact interventions to Purdue and its Board. Among them was perhaps McKinsey's most audacious gambit of the entire Purdue relationship: paying money – "rebates" – to health insurers whenever someone overdosed on Purdue's drug.

187.    Once again, in perfect McKinsey parlance[57], these payments for future OxyContin overdoses were christened "Event-Based contracts." To wit:

---

[55]    *Id.*

[56]    McDonald, *supra* note 2, at 35.

[57]    "Consultant-ese," when applied to work as grim as maximizing opioid sales in the face of a national disaster, led one former McKinsey consultant to state: "This is the banality of evil, M.B.A. edition." Walt Bogdanich & Michael Forsythe, *McKinsey Proposed Paying Pharmacy Companies*

188.    Helpfully, McKinsey provided estimates for the future costs of these "events."[58] McKinsey noted that, if Purdue were to start making overdose payments, it would "need to determine which payment amount is optimal."

189.    A "meaningful" amount, according to McKinsey, would be somewhere between six and fifteen thousand dollars for each person who overdoses or develops opioid-use disorder as a result of Purdue's drugs:

*Rebates for OxyContin Overdoses*, N.Y. TIMES (Nov. 27, 2020), https://www.nytimes.com/2020/11/27/business/mckinsey-purdue-oxycontin-opioids.html.

[58]  McKinsey defined an "event" as "first occurrence for overdose or opioid use disorder."

190.    The money would be paid to health insurers for the increased costs of additional medical services that resulted from the fact that Purdue's medications caused opioid-use disorder and overdoses in people whose health care costs were the payors' obligation. The money McKinsey proposed Purdue pay out in these circumstances would not go to the individuals afflicted, nor the estates of the dead.

### 1.    Guilty Again

191.    On October 20, 2020, Purdue – McKinsey's co-conspirator – agreed with the DOJ to plead guilty to improper marketing of OxyContin and other opioids again. This time the plea agreement concerned conduct from 2010 to 2018.

192.    Purdue agreed to plead guilty to a dual-object conspiracy to defraud the United States and to violate the Food, Drug, and Cosmetic Act, 21 U.S.C. §§331 and 353, among other charges, relating to its opioid sales and marketing practices after the 2007 guilty plea.

193.    The new plea agreement does not identify Purdue's co-conspirators, and McKinsey is not identified by name in the plea agreement. Instead, McKinsey is referred to as the "consulting company."

194.     Purdue's new guilty plea concerns Covered Conduct (as defined in the plea agreement) that directly implicates McKinsey in the conspiracy. It is the same conduct described in this Complaint.

195.     Indeed, the plea agreement signed by McKinsey's co-conspirator states bluntly: "Purdue, *in collaboration with [McKinsey]*, implemented many of [McKinsey's] recommendations." (emphasis added).

196.     Further, Purdue admitted that E2E "*was overseen by [McKinsey]* and some of Purdue's top executives through the creation of the E2E Executive Oversight Team ("EOT") and Project Management Office ("PMO")." (emphasis added).

**2.     A *Mea Culpa***

197.     On December 5, 2020, McKinsey issued a rare public statement regarding its work with a specific client on its website. The client was Purdue, and the statement was issued is response to Purdue's second guilty plea and recent media reports regarding McKinsey's work selling OxyContin after 2007:

# McKinsey statement on its past work with Purdue Pharma

*December 5, 2020*—As we look back at our client service during the opioid crisis, we recognize that we did not adequately acknowledge the epidemic unfolding in our communities or the terrible impact of opioid misuse and addiction on millions of families across the country. That is why last year we stopped doing any work on opioid-specific business, anywhere in the world.

Our work with Purdue was designed to support the legal prescription and use of opioids for patients with legitimate medical needs, and any suggestion that our work sought to increase overdoses or misuse and worsen a public health crisis is wrong. That said, we recognize that we have a responsibility to take into account the broader context and implications of the work that we do. Our work for Purdue fell short of that standard.

We have been undertaking a full review of the work in question, including into the 2018 email exchange which referenced potential deletion of documents. We continue to cooperate fully with the authorities investigating these matters.

198.    As the statement indicates, McKinsey stopped doing work "anywhere in the world." Given that Purdue's operations addressed only the United States, the global reach of McKinsey's regret is noteworthy.

199.    In August 2013, when the Sacklers adopted McKinsey's "Project Turbocharge" for Purdue, Tim Reiner ("Reiner"), a long-time McKinsey consultant, joined Mundipharma. Mundipharma is a separate company – also owned by the Sacklers – that sells opioids internationally.

200.    Reiner served as the Chief Business Officer at Mundipharma from January 2017 through September 2020. As late as 2019, Mundipharma has been asserting many of the same misleading claims about opioids that previously led to criminal liability in the United States.[59]

201.    "It's right out of the playbook of Big Tobacco. As the United States takes steps to limit sales here, the company goes abroad," stated former commissioner of the FDA, David Kessler.[60]

## VI.    CLASS ACTION ALLEGATIONS

202.    Plaintiff brings this case on behalf of itself and all other similarly situated persons as a class action under Rules 23(b)(1)-(3) and (c)(4) of the Federal Rules of Civil Procedure on behalf of all members of the following Class:

> All health insurance companies, third-party administrators, health maintenance organizations, self-funded health and welfare benefit plans, third-party payors and any other health benefit providers, in the United States of America and its territories, who have, from the inception of Opioid Marketing Enterprise Members' course of allegedly RICO-violative conduct as alleged herein, through a date to be established by the Court (such as the date of approval of Class notice), paid or incurred costs for prescription opioids manufactured, marketed, sold, or distributed by the Opioid Marketing Enterprise Members, for purposes other than resale, and/or paid or incurred costs for treatment related to the misuse, addiction, and/or overdose of opioid drugs.

> This Class excludes: (a) Defendant and its subsidiaries, affiliates, and controlled persons; (b) Defendant's officers, directors, agents, servants, or employees, and the

---

[59]  *See* Erika Kinetz, *Fake doctors, pilfered medical records drive Oxy China sales*, Assoc. Press (Nov. 20, 2019), https://apnews.com/article/lawsuits-ap-top-news-opioids-international-news-health-4122af46fdba42119ae3db30aa13537c.

[60]  Harriet Ryan, Lisa Girion, & Scott Glover, *OxyContin goes global – "We're only just getting started,"* L.A. Times (Dec. 18, 2016), https://www.latimes.com/projects/la-me-oxycontin-part3/.

immediate family members of any such person; (c) all persons who and entities that make a timely election to be excluded from the proposed Class; (d) all federal and state government entities except for cities, towns, municipalities, or counties with self-funded prescription drug plans; (e) pharmacy benefit managers; (f) any Opioid manufacturers, distributors, and retailers named in actions pending in MDL No. 2804 (N.D. Ohio); and (g) any judges or justices involved in this action and any members of their immediate families.

203. Plaintiff reserves the right to amend or modify the Class definition with greater specificity or further division into subclasses or limitation to particular issues.

204. **Numerosity**. The potential members of the Class as defined are so numerous that joinder of all members is unfeasible and not practicable.

205. **Commonality and Predominance**. There are questions of law and fact common to the Class, which predominate over any questions affecting only individual Class members. These common questions of law and fact include, but are not limited to:

(a) whether Defendant misrepresented the safety and efficacy of opioids, to the financial detriment of the Class;

(b) whether Defendant engaged in a conspiracy or conspiracies to promote the sales of opioids;

(c) whether Defendant engaged in a conspiracy or conspiracies to suppress adverse information about opioids;

(d) whether Defendant substantially caused or contributed to the opioid epidemic;

(e) whether Defendant's conduct in creating, proposing, and implementing sales and marketing strategies for opioids manufactured by Purdue before and after Purdue's first guilty plea in 2007 relating to misbranding of OxyContin contributed to the Class' injuries;

(f) whether Defendant performed reasonable due diligence in ascertaining the risks associated with its strategies for "turbocharging" OxyContin sales at Purdue in 2013 and thereafter;

(g) whether Defendant's implementation of sales and marketing strategies for its clients caused or contributed to an increase in opioid addiction;

1    (h)    whether developing plans for its clients to market and sell opioids,

2    Defendant failed to disclose the dangers and risks to the health of persons ingesting the drug;

3    (i)    whether Defendant conspired with its clients to misrepresent in their

4    advertisements, promotional materials and other materials, among other things, the safety,

5    potential side effects, and convenience of opioids;

6    (j)    whether Defendant knowingly omitted, suppressed, and/or concealed

7    material facts about the unsafe and defective nature of opioids from government regulators;

8    (k)    whether Defendant engaged in conduct that violates federal RICO statutes

9    in promoting the sales of and suppressing adverse information about opioids;

10   (l)    whether Defendant engaged in a conspiracy to promote the sales of and

11   suppress adverse information about opioids in violation of federal RICO statutes;

12   (m)   whether Defendant engaged in a pattern of deceptive, fraudulent and/or

13   improper activity;

14   (n)    whether Defendant engaged in the conduct alleged herein;

15   (o)    whether Defendant and the other Opioid Marketing Enterprise Members

16   formed the Opioid Marketing Enterprise for the purpose of effectuating their fraudulent schemes;

17   (p)    whether the Opioid Marketing Enterprise Members used the United States

18   mail and interstate wire facilities to carry out their fraudulent scheme;

19   (q)    whether the Opioid Marketing Enterprise Members engaged in a pattern of

20   racketeering;

21   (r)    whether Defendant's conduct, in whole or in part, has substantially affected

22   interstate and intrastate commerce;

23   (s)    whether Defendant unjustly enriched itself to the detriment of Plaintiff and

24   the members of the Class;

25   (t)    whether the conduct of Defendant, as alleged in this Complaint, caused

26   injury to the business or property of Plaintiff and the members of the Class, and if so, the

27   appropriate Class-wide measure of damages;

28

COMPLAINT -                                                                                          - 45 -
4873-1648-5695.v1

1          (u)    whether Plaintiff and the Class paid for more opioids than for other

2 efficacious drugs that were available at cheaper prices, and/or paid for more opioids due to

3 addiction, and/or paid for treatment, including drug addiction treatment, and emergency medical

4 care including the costs of opioid overdose reversal drugs, such as Naloxone Hydrochloride

5 (Narcan), as a result of the abuse, misuse, addiction, and/or overdose of opioids;

6          (v)    whether the Class has been damaged, and if so, the extent of such damages

7 and/or the nature of the equitable relief, statutory damages, or punitive damages to which the Class

8 is entitled; and

9          (w)    the amount of attorneys' fees, prejudgment interest, and costs of the suit to

10 which the Class is entitled.

11     206.   **Typicality**. The claims of the named Plaintiff is typical to the claims of the Class.

12 Plaintiff and all Class members were exposed to undeviating behavior and sustained damages

13 arising out of and caused by Defendant's unlawful conduct.

14     207.   **Adequacy of Representation**. Plaintiff will fairly and adequately represent and

15 protect the interests of the members of the Class. Plaintiff has retained counsel with substantial

16 experience in prosecuting complex litigation and class actions. Plaintiff and its counsel are

17 committed to vigorously prosecuting this action on behalf of the Class members and have the

18 financial resources to do so. Neither Plaintiff nor its counsel has any interest adverse to those of

19 other Class members.

20     208.   **Superiority of Class Action**. A class action is superior to other available methods

21 for the fair and efficient adjudication of this controversy since joinder of all the members of the

22 Class is impracticable. Furthermore, the adjudication of this controversy through a class action

23 will avoid the possibility of inconsistent and potentially conflicting adjudication of the claims

24 asserted herein. While certain individual claims relating to the opioid epidemic against other

25 defendants involved in the opioid stream of commerce have already been initiated by a few Class

26 members, no Class member has initiated any action against McKinsey. A class action would

27 provide a superior vehicle for resolving the issues for all similarly affected and situated. Moreover,

28 based upon the considerable anticipated expense of discovery and case preparation, completion of

1    individual cases is not financially feasible for most Class members especially considering the

2    amount of damages in play for each member of the Class. There will be no difficulty in the

3    management of this action as a class action.

4         209.   **Policies Generally Applicable to the Class**: Defendant has acted and failed to act

5    on grounds generally applicable to Plaintiff and other Class members, requiring the Court's

6    imposition of uniform relief to ensure compatible standards of conduct toward the Class.

7         210.   **Notice to the Class**. Plaintiff contemplates that the eventual issuance of notice to

8    the proposed Class members would set forth the subject and nature of the instant action. Plaintiff

9    believes that information related to the total number of Class members at issue are sufficient for

10   direct mail notice to reach the vast majority of putative Class members. To the extent that any

11   further notices may be required, published notice in appropriate newspapers, professional

12   publications, and journals can also be provided.

13   **VII.    CAUSES OF ACTION**

14                          **COUNT I:**
     **Violation of Racketeer Influences and Corrupt Organizations (RICO),**
15                **18 U.S.C. §1961, *et seq.***

16        211.   Plaintiff and the Class incorporate by reference all preceding paragraphs of this

17   Complaint as if fully set forth herein, and further alleges as follows:

18        212.   This claim is brought by Plaintiff and the Class against McKinsey for actual

19   damages, treble damages, and equitable relief under 18 U.S.C. §1964, for violations of 18 U.S.C.

20   §1961, *et seq*.

21        213.   At all relevant times, McKinsey is and has been a "person" under 18 U.S.C.

22   §1961(3) because it is capable of holding, and does hold, "a legal or beneficial interest in property."

23        214.   Plaintiff is a "person," as that term is defined in 18 U.S.C. §1961(3), and has

24   standing to sue as it was and is injured in its business and/or property as a result of Defendant's

25   wrongful conduct described herein.

26        215.   The Opioid Marketing Enterprise conducted an association-in-fact enterprise,

27   and/or participated in the conduct of an enterprise through a pattern of illegal activities (the

28   predicate racketeering acts of mail and wire fraud) to carry-out the common purpose of the Opioid

1  Marketing Enterprise, *i.e.*, to unlawfully increase profits and revenues from the continued

2  prescription and use of opioids for long-term chronic pain. Through the racketeering activities of

3  the Opioid Marketing Enterprise, the Opioid Marketing Enterprise Members sought to further the

4  common purpose of the enterprise through a fraudulent scheme to change prescriber habits and

5  public perception about the safety and efficacy of opioid use. In so doing, each of the Opioid

6  Marketing Enterprise Members knowingly conducted and participated in the conduct of the Opioid

7  Marketing Activities by engaging in mail and wire fraud in violation of 18 U.S.C. §1962(c)-(d).

8       216.   The Opioid Marketing Enterprise is an association-in-fact enterprise that consists

9  of the Opioid Marketing Enterprise Members.

10      217.   Each of the Opioid Marketing Enterprise Members conducted and participated in

11 the conduct of the Opioid Marketing Enterprise by playing a distinct role in furthering the

12 enterprise's common purpose of increasing profits and sales through the knowing and intentional

13 dissemination of false and misleading information about the safety and efficacy of long-term

14 opioid use, and the risks and symptoms of addiction, in order to increase the market for prescription

15 opioids by changing prescriber habits and public perceptions.

16      218.   Specifically, the Opioid Marketing Enterprise Members each worked together to

17 coordinate the enterprise's goals and conceal their role, and the enterprise's existence, from the

18 public by, among other things: (a:) funding, editing, and distributing publications that supported

19 and advanced their false messages; (b) funding key opinion leaders ("KOLs") to further promote

20 their false messages; and (c) tasking their own employees to direct deceptive marketing materials

21 and pitches directly at physicians.

22      219.   Further, each of the Opioid Marketing Enterprise Members had systematic links to

23 and personal relationships with each other through joint participation in lobbying groups, trade

24 industry organizations, contractual relationships, and continuing coordination of activities. The

25 systematic links and personal relationships that were formed and developed allowed members of

26 the Opioid Marketing Enterprise the opportunity to form the common purpose and agree to conduct

27 and participate in the conduct of the Opioid Marketing Enterprise. Specifically, each of the Opioid

28 Marketing Enterprise Members, including McKinsey working with and through the other Opioid

1    Marketing Enterprise Members, coordinated their efforts through the same KOLs and front groups,

2    based on their agreement and understanding that the front groups and KOLs were industry friendly

3    and would work together with the Opioid Marketing Enterprise Members to advance the common

4    purpose of the Opioid Marketing Enterprise; and each of the individuals and entities who formed

5    the Opioid Marketing Enterprise acted to enable the common purpose and fraudulent scheme of

6    the Opioid Marketing Enterprise.

7        220.    At all relevant times, the Opioid Marketing Enterprise: (a) had an existence separate

8    and distinct from Defendant the other Opioid Marketing Enterprise Members; (b) was separate and

9    distinct from the pattern of racketeering in which the Opioid Marketing Enterprise Members

10   engaged; (c) was an ongoing and continuing organization consisting of individuals, persons, and

11   legal entities, including each of the Opioid Marketing Enterprise Members; (d) was characterized

12   by interpersonal relationships between and among each member of the Opioid Marketing

13   Enterprise; and (e) had sufficient longevity for the enterprise to pursue its purpose and functioned

14   as a continuing unit.

15       221.    The Opioid Marketing Enterprise Members conducted and participated in the

16   conduct of the Opioid Marketing Enterprise through a pattern of racketeering activity that

17   employed the use of mail and wire facilities, in violation of 18 U.S.C. §1341 (mail fraud) and

18   §1343 (wire fraud), to increase profits and revenue by changing prescriber habits and public

19   perceptions in order to increase the prescription and use of prescription opioids, and expand the

20   market for opioids.

21       222.    The Opioid Marketing Enterprise Members each committed, conspired to commit,

22   and/or aided and abetted in the commission of at least two predicate acts of racketeering activity

23   (*i.e.*, violations of 18 U.S.C. §§1341 and 1343) within the past ten years. The multiple acts of

24   racketeering activity that the Opioid Marketing Enterprise Members committed, or aided and

25   abetted in the commission of, were related to each other, posed a threat of continued racketeering

26   activity, and, therefore, constitute a "pattern of racketeering activity." The racketeering activity

27   was made possible by the Opioid Marketing Enterprise Members' regular use of the facilities,

28   services, distribution channels, and employees of the Opioid Marketing Enterprise, the United

1   States mail and interstate wire facilities. The Opioid Marketing Enterprise Members participated

2   in the scheme to defraud by using mail, telephones, and the Internet to transmit mailings and wires

3   in interstate or foreign commerce.

4       223.   The Opioid Marketing Enterprise Members' predicate acts of racketeering, 18

5   U.S.C. §1961(1), include, but are not limited to:

6       (a)   Mail Fraud: The Opioid Marketing Enterprise Members violated 18 U.S.C.

7   §1341 by sending or receiving, or by causing to be sent and/or received, materials via United States

8   mail or commercial interstate carriers for the purpose of executing the unlawful scheme to design,

9   manufacture, market, and sell the prescription opioids by means of false pretenses,

10  misrepresentations, promises, and omissions.

11      (b)   Wire Fraud: The Opioid Marketing Enterprise Members violated 18 U.S.C.

12  §1343 by transmitting and/or receiving, or by causing to be transmitted and/or received, materials

13  by wire for the purpose of executing the unlawful scheme to design, manufacture, market, and sell

14  the prescription opioids by means of false pretenses, misrepresentations, promises, and omissions.

15      224.   Indeed, as summarized herein, the Opioid Marketing Enterprise Members used the

16  mail and wires to send or receive thousands of communications, publications, representations,

17  statements, electronic transmissions, and payments to carry-out the Opioid Marketing Enterprise's

18  fraudulent scheme.

19      225.   Because the Opioid Marketing Enterprise Members disguised their participation in

20  the enterprise, and worked to keep even the enterprise's existence secret so as to give the false

21  appearance that their false messages reflected the views of independent third parties, many of the

22  precise dates of the Opioid Marketing Enterprise's uses of the United States mail and interstate

23  wire facilities (and corresponding predicate acts of mail and wire fraud) have been hidden and

24  cannot be alleged without access to the books and records maintained by the Opioid Marketing

25  Enterprise Members, front groups, and KOLs. Indeed, an essential part of the successful operation

26  of the Opioid Marketing Enterprise alleged herein depended upon secrecy. However, Plaintiff has

27  described the occasions on which the Opioid Marketing Enterprise Members disseminated

28

COMPLAINT -
4873-1648-5695.v1

1   misrepresentations and false statements to consumers, prescribers, regulators, and Plaintiff, and

2   how those acts were in furtherance of the scheme.

3       226.    Each instance of racketeering activity alleged herein was related, had similar

4   purposes, involved the same or similar participants and methods of commission, and had similar

5   results affecting similar victims, including consumers, prescribers, regulators, and Plaintiff. The

6   Opioid Marketing Enterprise Members calculated and intentionally crafted the scheme and

7   common purpose of the Opioid Marketing Enterprise to ensure their own profits remained high.

8   In designing and implementing the scheme, the Opioid Marketing Enterprise Members understood

9   and intended that those in the distribution chain rely on the integrity of the pharmaceutical

10  companies and ostensibly neutral third parties to provide objective and scientific evidence

11  regarding the Opioid Marketing Enterprise Members' products.

12      227.    The Opioid Marketing Enterprise Members' pattern of racketeering activity alleged

13  herein and the Opioid Marketing Enterprise are separate and distinct from each other. Likewise,

14  the Opioid Marketing Enterprise Members are distinct from the Opioid Marketing Enterprise.

15      228.    The racketeering activities conducted by the Opioid Marketing Enterprise Members

16  amounted to a common course of conduct, with a similar pattern and purpose, intended to deceive

17  consumers, prescribers, regulators and Plaintiff. Each separate use of the United States mail and/or

18  interstate wire facilities employed by Defendant was related, had similar intended purposes,

19  involved similar participants and methods of execution, and had the same results affecting the

20  same victims, including consumers, prescribers, regulators, and Plaintiff. The Opioid Marketing

21  Enterprise Members have engaged in the pattern of racketeering activity for the purpose of

22  conducting the ongoing business affairs of the Opioid Marketing Enterprise.

23      229.    Each of the Opioid Marketing Enterprise Members aided and abetted others in the

24  violations of the above laws, thereby rendering them indictable as principals in the 18 U.S.C.

25  §§1341 and 1343 offenses.

26      230.    As described herein, the Opioid Marketing Enterprise Members engaged in a

27  pattern of related and continuous predicate acts for years. The predicate acts constituted a variety

28  of unlawful activities, each conducted with the common purpose of obtaining significant money

1   and revenue from the marketing and sale of their highly addictive and dangerous drugs. The

2   predicate acts also had the same or similar results, participants, victims, and methods of

3   commission. The predicate acts were related and not isolated events.

4          231.    The Opioid Marketing Enterprise Members' violations of law and their pattern of

5   racketeering activity directly and proximately caused Plaintiff injury in its business and property.

6   The Opioid Marketing Enterprise Members' pattern of racketeering activity logically,

7   substantially, and foreseeably caused an opioid epidemic. Plaintiff's injuries, as described below,

8   were not unexpected, unforeseen, or independent. Rather, as Plaintiff alleges, the Opioid

9   Marketing Enterprise Members knew that the opioids were unsuited to treatment of long-term

10  chronic, nonacute, and non-cancer pain, or for any other use not approved by the FDA, and knew

11  that opioids were highly addictive and subject to abuse. Nevertheless, the Opioid Marketing

12  Enterprise Members engaged in a scheme of deception that utilized the mail and wires in order to

13  carry-out the Opioid Marketing Enterprises' fraudulent scheme, thereby increasing sales of their

14  opioid products.

15         232.    It was foreseeable and expected that the Opioid Marketing Enterprise Members

16  creating and then participating in the Opioid Marketing Enterprise through a pattern of

17  racketeering activities to carry-out their fraudulent scheme would lead to a nationwide opioid

18  epidemic, including increased opioid addiction and overdose.

19         233.    Defendant's misleading marketing and failure to prevent prescription opioid

20  diversion damaged Plaintiff and its authorizing tribes and villages. Defendant's misconduct has

21  contributed to a range of social problems, including violence and delinquency. Adverse social

22  outcomes include child neglect, family dysfunction, babies born addicted to opioids, criminal

23  behavior, poverty, property damage, unemployment, and social despair. As a result, more and more

24  of Plaintiff's resources are devoted to addiction-related problems.

25         234.    Specifically, the Opioid Marketing Enterprise Members' creation of, and then

26  participation in, the Opioid Marketing Enterprise through a pattern of racketeering activities to

27  carry-out their fraudulent scheme has injured Plaintiff in the form of substantial losses of money

28  and property that logically, directly, and foreseeably arise from the opioid-addiction epidemic.

1    Plaintiff's injuries, as alleged throughout this Complaint, and expressly incorporated herein by

2    reference, include:

3              (a)      costs for providing healthcare and medical care, additional therapeutic, and

4    prescription drug purchases, and other treatments for patients suffering from opioid-related

5    addiction or disease, including overdoses and deaths;

6              (b)      costs for providing mental-health services, treatment, counseling, and

7    rehabilitation services, to victims of the opioid epidemic and their families;

8              (c)      costs for providing treatment of infants born with opioid-related medical

9    conditions, or born dependent on opioids due to drug use by mother during pregnancy; and

10             (d)      costs associated with the injuries to the health and welfare of Plaintiff and

11   people whose health care costs were the payors' obligation.

12       235.    Plaintiff's injuries were directly and, thus, proximately caused by these

13   racketeering activities because they were the logical, substantial, and foreseeable cause of

14   Plaintiff's injuries. But for the opioid-addiction epidemic the Opioid Marketing Enterprise

15   Members created through their Opioid Marketing Enterprise, Plaintiff would not have lost money

16   or property, and the health and welfare of people whose health care costs were the payors'

17   obligation would not have been injured.

18       236.    Plaintiff is the most directly harmed entity, and there are no other plaintiffs better

19   suited to seek a remedy for the economic harms at issue here.

20       237.    Plaintiff seeks all legal and equitable relief as allowed by law, including, *inter alia*,

21   actual damages; treble damages; equitable and/or injunctive relief in the form of Court-supervised

22   corrective communication, actions, and programs; forfeiture as deemed proper by the Court;

23   attorneys' fees; all costs and expenses of suit; and pre- and post-judgment interest, including, *inter*

24   *alia*:

25             (a)      actual damages and treble damages, including pre-suit and post-judgment

26   interest;

27             (b)      an Order enjoining any further violations of RICO;

28

COMPLAINT -                                                                                      - 53 -
4873-1648-5695.v1

1   (c)     an Order enjoining any further violations of any statutes alleged to have

2   been violated in this Complaint;

3   (d)     an Order enjoining the commission of any tortious conduct, as alleged in

4   this Complaint;

5   (e)     an Order enjoining any future marketing or misrepresentations regarding

6   the health benefits or risks of prescription opioids use, except as specifically approved by the FDA;

7   (f)     an Order enjoining any future marketing of opioids through non-branded

8   marketing including through front groups, KOLs, websites, or in any other manner alleged in this

9   Complaint that deviates from the manner or method in which such marketing has been approved

10   by the FDA;

11   (g)     an Order enjoining any future marketing to vulnerable populations,

12   including, but not limited to, persons over the age of 55 years old, anyone under the age of 21

13   years old, and veterans;

14   (h)     an Order requiring McKinsey to publicly disclose all documents,

15   communications, records, data, information, research, or studies related to its work with Purdue

16   and other manufacturers of opioids;

17   (i)     an Order divesting McKinsey of any interest in, and the proceeds of any

18   work related to opioids;

19   (j)     forfeiture as deemed appropriate by the Court; and

20   (k)     attorneys' fees and all costs and expenses of suit.

21   **COUNT II:**
   **Fraud (Actual and Constructive) and Deceit**
22

23   238.    Plaintiff and the Class incorporate by reference the preceding paragraphs as if fully

    set forth herein, and further allege as follows:
24

25   239.    McKinsey is liable for both fraudulent concealment and non-disclosure. *See, e.g.*,

    Restatement (Second) of Torts §§550-551 (1977).
26

27   240.    Specifically, McKinsey committed fraud by acting to conceal and advising the

28   concealment of the true dangers of opioids and Purdue's prior misconduct while working to

COMPLAINT -                                                                                    - 54 -
4873-1648-5695.v1

1    increase sales of opioids through its consulting work for Purdue and others, and concealing all of

2    this information from regulators and Plaintiff and the Class.

3         241.    A reasonable consumer would not have expected that the opioids promoted by

4    McKinsey via its clients were unreasonably dangerous and addictive and that McKinsey's clients

5    were failing to follow state and federal law, including the Controlled Substances Act.

6         242.    McKinsey knew that these facts about opioids would be important to health and

7    welfare benefit plans like Plaintiff and the Class. McKinsey ensured that Plaintiff did not discover

8    this information through actively concealing it. McKinsey intended for Plaintiff to rely on their

9    omissions – which it did by indirectly purchasing, paying, and reimbursing for opioids intended

10   for consumption by its members, retirees, and their families and for substance abuse treatment.

11        243.    McKinsey had a duty to disclose the true dangers of opioids. These important facts

12   were known and/or accessible only to McKinsey, including due to its detailed involvement in its

13   clients' sales and marketing strategies. McKinsey also knew the addictive and potentially harmful

14   nature of opioids was not known to or reasonably discoverable by Plaintiff. If McKinsey had

15   disclosed these material facts, Plaintiff would have seen them.

16        244.    McKinsey also had a duty to disclose the true nature of opioids in light of its

17   affirmative statements, by and through its clients, about opioids with respect to their safety and

18   side effects, among other factors. In its clients' campaigns, McKinsey intentionally concealed,

19   suppressed, and failed to disclose to Plaintiff that opioids were unsafe and could result in life-

20   threatening, and indeed life-ending, side effects.

21        245.    McKinsey knew these statements were misleading, deceptive, and incomplete

22   without the disclosure of the additional facts set forth above regarding the nature of opioids.

23   Because McKinsey, by and through its clients, volunteered to provide information about opioids

24   that McKinsey's clients offered for sale indirectly to Plaintiff and its members, retirees, and their

25   families, McKinsey had the duty to disclose the whole truth. It did not.

26        246.    McKinsey did not fulfill its duties to disclose to Plaintiff. Instead, it actively

27   concealed the truth, including during regulatory processes and throughout its clients' marketing

28   and sale of opioids.

COMPLAINT -                                                                                    - 55 -
4873-1648-5695.v1

247.    McKinsey's deceptive actions harmed Plaintiff and the Class. Because McKinsey fraudulently concealed the truth about opioids' dangers, Plaintiff and the Class suffered economic losses. Plaintiff and the Class suffered damages including, but not limited to, indirect payments for opioids and for substance abuse treatment. Accordingly, McKinsey is liable to Plaintiff and the Class for damages in an amount to be proven at trial.

248.    McKinsey's acts were done wantonly, maliciously, oppressively, deliberately, with intent to defraud; in reckless disregard of the rights of Plaintiff and the Class; and to enrich itself. Its misconduct warrants an assessment of punitive damages in an amount sufficient to deter such conduct in the future, which amount shall be determined according to proof at trial.

**COUNT III:**
**Unjust Enrichment**

249.    Plaintiff and the Class incorporate by reference the preceding paragraphs as if fully set forth herein, and further allege as follows:

250.    As an expected and intended result of their conscious wrongdoing as set forth in this Complaint, McKinsey has profited and benefited from the increase in the distribution and purchase of opioids to those whose health care costs were the payors' obligation, including from opioids foreseeably and deliberately diverted within and into those communities.

251.    Plaintiff has expended substantial amounts of money to fix or mitigate the societal harms caused by McKinsey's conduct. Plaintiff has conferred a benefit upon McKinsey by paying for what may be called McKinsey's externalities – the costs of the harm caused by McKinsey's negligent or otherwise unlawful distribution and sales practices.

252.    McKinsey is aware of this obvious benefit, and that retention of this benefit is unjust.

253.    Because of their deceptive marketing of prescription opioids, McKinsey obtained enrichment they would not otherwise have obtained. Because of their conscious failure to exercise due diligence in preventing diversion, McKinsey obtained enrichment it would not otherwise have obtained. The enrichment was without justification and Plaintiff lacks a remedy provided by law.

254.    McKinsey made substantial profits while fueling the prescription drug epidemic in the communities served by Plaintiff.

255.    McKinsey has been unjustly enriched by its negligent, intentional, malicious, oppressive, illegal, and unethical acts, omissions, and wrongdoing.

256.    It would be inequitable to allow McKinsey to retain benefit or financial advantage.

257.    McKinsey's misconduct alleged in this case has caused ongoing and persistent harm to Plaintiff.

258.    Plaintiff demands judgment against McKinsey for restitution, disgorgement, and any other relief allowed in law or equity.

## VIII.    JURY DEMAND

259.    Plaintiff, on behalf of itself and all others similarly situated, requests a trial by jury on all issues so triable.

## IX.    PRAYER FOR RELIEF

WHEREFORE, Plaintiff, on behalf of itself and all others similarly situated, respectfully prays that this Court grant the following relief:

A.      For an Order certifying the proposed Class herein;

B.      Enter judgment in favor of Plaintiff, on behalf of itself and all others similarly situated, against Defendant awarding Plaintiff its actual damages for the damages caused by the opioid epidemic, including, but not limited to: (a) costs for providing medical care, additional therapeutic and prescription drug purchases, and other treatments for patients suffering from opioid-related addiction or disease, including overdoses and deaths; and (b) costs for providing treatment, counseling, and rehabilitation services;

C.      Order Defendant to fund an "abatement fund" for the purposes of abating the opioid nuisance;

D.      Enjoin McKinsey from continuing or repeating the wrongful conduct alleged herein and from the publication and/or dissemination of false and misleading materials directly or indirectly;

E.      Enter judgment against Defendant requiring Defendant to pay punitive damages;

1      F.      Enter judgment against Defendant awarding Plaintiff its reasonable attorneys' fees,

2  all costs and expenses, pre- and post-judgment interest; and

3      G.      All other such and further relief as this Court may deem just and proper.

4  DATED: November 21, 2022          ROBBINS GELLER RUDMAN
5                                                          & DOWD LLP
                                                  AELISH M. BAIG
6                                                  TAEVA SHEFLER
                                                  HADIYA K. DESHMUKH

8                                           *s/ Aelish M. Baig*
                                             AELISH M. BAIG

Post Montgomery Center
One Montgomery Street, Suite 1800
San Francisco, CA  94104
Telephone:  415/288-4545
415/288-4534 (fax)
aelishb@rgrdlaw.com
tshefler@rgrdlaw.com
hdeshmukh@rgrdlaw.com

ROBBINS GELLER RUDMAN
 & DOWD LLP
PAUL J. GELLER
MARK J. DEARMAN
120 East Palmetto Park Road, Suite 500
Boca Raton, FL  33432
Telephone:  561/750-3000
561/750-3364 (fax)
pgeller@rgrdlaw.com
mdearman@rgrdlaw.com

ROBBINS GELLER RUDMAN
 & DOWD LLP
MARIO ALBA, JR.
58 South Service Road, Suite 200
Melville, NY  11747
Telephone:  631/367-7100
631/367-1173 (fax)
malba@rgrdlaw.com

MOGILA LAW GROUP
STEPHEN J. MOGILA
5 Penn Plaza, 23rd Floor
New York, NY  10001
Telephone:  917/399-8077
smogila@mogilalaw.com

*Attorneys for Plaintiff*